688 N.E.2d 642 (1997)
179 Ill.2d 184
227 Ill.Dec. 949
In re A.P., a Minor (The People of the State of Illinois, Appellee,
v.
Anthony P., Appellant).
No. 81022.
Supreme Court of Illinois.
November 20, 1997.
*644 Cook County Public Defender, Protase M. Tinka, Assistant Public Defender, Chicago, for Anthony P.
Richard A. Devine, State's Attorney Cook County, Jim Ryan, Attorney General, Criminal Appeals Div., Chicago, for the People.
Patrick T. Murphy, Public Guardian of Cook County, Chicago, for A.P.
Tyra Taylor-Bell, Assistant State's Attorney, Chicago, for Respondent/Appellee.
Justice BILANDIC delivered the opinion of the court:
This appeal arises out of a petition for adjudication of wardship filed by the State in the circuit court of Cook County requesting the court to adjudicate A.P., a four-year-old female child, a ward of the court and to remove A.P. from the home of her parents, Anthony P. and Louise B. After an adjudicatory hearing, the circuit court found that A.P. had been sexually abused by her father, the respondent. The circuit court subsequently found both parents to be unfit and that it was in the best interest of A.P. to adjudicate her a ward of the court and remove *645 her from the custody of her parents. The court placed A.P. in the guardianship of Gary T. Morgan, the Guardianship Administrator of the Department of Children and Family Services (DCFS), with the right to place A.P. The respondent appealed from the juvenile court's findings. The appellate court affirmed the judgment of the circuit court. No. 1-94-1928 (unpublished order under Supreme Court Rule 23). We allowed the respondent's petition for leave to appeal (166 Ill.2d R. 315; 134 Ill.2d R. 660(b)). For the reasons that follow, we affirm the judgment of the appellate court.

FACTS
The issues presented in this appeal require that we discuss the facts in some detail.
On March 24, 1993, a report was made to the DCFS child abuse hotline that A.P. had been sexually abused. On April 5, 1993, the State filed a petition for adjudication of wardship of A.P. pursuant to sections 2-3(2)(ii) and 2-3(2)(iii) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(2)(ii), (2)(iii) (West 1992)), alleging that there existed substantial risk of physical injury and sexual abuse to A.P. On that same date, the circuit court granted the State temporary custody of A.P. The court determined that there was probable cause that A.P. was abused and that it was necessary to remove A.P. from her parents' home. The Cook County public guardian was appointed as A.P.'s attorney and her guardian ad litem. An adjudicatory hearing was subsequently held to consider the allegations in the State's petition for adjudication of wardship. Such a proceeding is civil in nature such that a finding of abuse need only be supported by a preponderance of the evidence. 705 ILCS 405/2-18(1) (West 1992).
At the adjudicatory hearing, Michelle Weber testified that she and her boyfriend, Michael Bell, A.P.'s uncle, baby-sat A.P. on the evening of March 24, 1993, at the onebedroom apartment of A.P.'s parents. At some point during the evening, A.P. went into the bathroom. While in the bathroom, A.P. called Michelle and complained that "it hurt down there," pointing to her vagina. Michelle assumed A.P. had a rash and looked for some Vaseline, but was unable to find it. When it was time to put on A.P.'s pajamas, A.P. asked Michelle to first put on new underwear because "it hurts down there." Michelle asked where A.P. was hurting and A.P. again pointed to her vagina. A.P. indicated that she was hurt "when daddy was inside by my belly button." When Michelle asked her to show her where it hurt, A.P., who had her pants off, sat down on the floor, opened her legs, and pointed to her vagina. Michelle noticed that A.P.'s vagina was red, and the vaginal opening was about the size of a quarter.
A.P. then began to get excited and say things like "toe-toe" and "doe-doe," which Michelle did not understand. Michelle attempted to calm A.P. A.P. again complained that her "peepee" hurt and that her father had hurt her down there "when he was inside me." When Michelle asked who had hurt her, A.P. said "daddy." Michelle then dressed A.P. for bed and laid her on her mattress, which was next to her parents' mattress. Later in the evening, Michelle heard A.P. in the bedroom screaming and calling out: "owie, owie, no, no," "daddy," and "it hurts, it hurts." Michelle told Michael what had happened and Michael called his mother, A.P.'s maternal grandmother. A.P. was later taken to the emergency room at the hospital. After being released from the hospital, A.P. stayed with an aunt and uncle for a couple of days. About two days after A.P.'s release from the hospital, Michelle visited her. A.P. began saying "toetoe" and "doe-doe" again. Michelle asked her what that meant and A.P. pointed to her vagina and said "toe-toe."
Jennifer Daniels, the assistant director of the Children's Advocacy Center of Northwest Cook County, testified that A.P.'s case was referred to her agency following a hotline report to DCFS. Daniels interviewed A.P. on March 30 and April 1, 1993. At the initial interview, Daniels asked A.P. if she knew why she was at the center. A.P. responded that this was the place to talk about "daddy." Daniels then asked A.P. if she had ever stayed with anybody besides her parents, and A.P. stated that she had stayed with her aunt and uncle. When Daniels *646 asked A.P. if she had been to the hospital, A.P. stated that her uncle took her to the hospital because "daddy hurt my peepee." Daniels questioned A.P. about how her father had hurt her, and A.P. said: "Daddy took a knife and hit me on my peepee." Daniels inquired about what A.P. was wearing when this happened. A.P. responded that she was wearing a nightgown and that her father pulled up the nightgown over her head but did not remove it.
During this initial interview, A.P. was asked to identify body parts on an anatomically correct female doll, and she referred to the vagina as "peepee." A.P. also identified body parts on an anatomically correct male doll, whose penis she referred to as "peepee." When asked to demonstrate how her father had hurt her on her peepee, A.P. hit the vagina of the doll, and said that the knife cut her. There were play utensils in the interview room. A.P. took a play knife and used it to hit the doll's vagina using the flat side of the blade. A.P. said the knife went inside her. On cross-examination, Daniels admitted that A.P. stated that she had not seen her father undressing or showering, and that her father had not shown her his penis.
Also during the first interview, A.P. indicated to Daniels that she told her Aunt Michelle what had happened. A.P. initially denied that she had told her mother about the incident. Later, A.P. said that she had told her mother and that her mother had sent her to her room. A.P. never stated when the incident with her father happened. Daniels testified that A.P. never indicated that anyone other than her father had abused her.
Daniels interviewed A.P. again on April 1, 1993. A.P. indicated that she remembered talking previously with Daniels about her father. A.P. said she saw her father after the interview on March 30 and that her father was mad that she "told." A.P. subsequently became upset and refused to talk to Daniels any further about her father.
Karen Beckelman, a child protection investigator for DCFS, testified that she observed and listened to Jennifer Daniels interview A.P. on March 30 and April 1, 1993. Beckelman heard A.P. make statements that she had been sexually molested by her father.
Throughout the interview on March 30, A.P. did not name any other perpetrators. After the March 30 interview, Beckelman permitted A.P.'s mother, Louise, to take A.P. home; however, she instructed her that A.P. was to have no contact with the respondent. After observing the second interview of A.P., Beckelman learned that A.P. had contact with her father when he stayed overnight at her mother's apartment. As a result of A.P.'s unauthorized contact with the respondent, Beckelman sought protective custody of A.P.
Dr. Constance Blade, a pediatrician and expert on child abuse, examined A.P. on April 1 and April 8, 1993. Using a special instrument, a colposcope, which provides light and magnification, Dr. Blade examined A.P.'s anal and genital anatomy. Dr. Blade found that A.P. had an abnormal hymen in that its opening was enlarged and it had an irregular border. A.P.'s hymen indicated to Dr. Blade that A.P. had suffered a previous trauma to the bottom part of her hymen, where it was thickened. Further, the opening in A.P.'s hymen was about six or seven millimeters. A girl of A.P.'s age usually has an opening of two millimeters in diameter. According to Dr. Blade, the upper limit of normal for a girl A.P.'s age was four millimeters. Dr. Blade also found a notch in A.P.'s hymen, which she believed indicated that something had previously stretched the hymen beyond its elasticity, causing it to tear.
Following her examinations of A.P., Dr. Blade diagnosed A.P. as having been sexually abused. The examinations revealed a penetration, which she assessed was caused by either a finger or a foreign object inserted into A.P.'s vagina. However, Dr. Blade did not believe there had been penile penetration, because the physical damage would have been far greater and there would be more abnormalities in her genital examination. When she examined A.P., there was no inflammation or evidence that there was current healing. Rather, A.P. had already healed. Dr. Blade opined that the injury had been inflicted two weeks or more before A.P.'s examination because that area of the anatomy heals quickly.
*647 Dr. Blade further described that the hymen is well protected by its location, which is recessed a full inch into the vagina. The hymen is also well protected by the thigh muscles and the bones of the pelvis. Given that the hymen is located in such a wellprotected environment, Dr. Blade found that it was highly unlikely that A.P. had sustained her injuries during a fall. Although a fall was a possible cause, that fall would have had to entail her falling directly onto something that was small enough to penetrate in between the muscles and pelvic bones to injure the hymen. However, had A.P. fallen onto something small enough to cause injury to her hymen, there would have been significant damage requiring emergency care. Dr. Blade did not see any indication of such damage. Dr. Blade further explained that it was unlikely that A.P. had injured herself through masturbation because an injury like A.P.'s would have hurt when inflicted. Dr. Blade noted that children who masturbate generally touch areas anterior to the hymen and do so in such a way that it feels pleasurable. After considering all the possible explanations, including the possibility of A.P.'s falling or masturbating, Dr. Blade concluded that A.P. was sexually abused.
Dr. Blade examined the records of A.P.'s emergency room visit on March 24, 1993. Dr. Blade found that those records were not inconsistent with her diagnosis of sexual abuse. Dr. Blade explained that although an emergency room doctor therein noted that A.P.'s hymen was "intact," such terminology traditionally meant "virginal," meaning no penile penetration. According to Dr. Blade, a minor can have an "intact" hymen and there can still be evidence of sexual abuse by digital penetration. Dr. Blade noted that the emergency room doctor had conducted only an external examination, and had not conducted an internal examination using a colposcope. The emergency room doctor had therefore missed evidence of sexual abuse. Dr. Blade explained that emergency room doctors are not trained to look closely for evidence of sexual abuse.
The final witness for the State was Ann Maria Caravello, A.P.'s aunt. Caravello testified that A.P. and A.P.'s mother lived with her and her husband, Brian, in Arlington Heights, Illinois, during the summer of 1991. Thereafter, A.P. and her mother moved into a battered women's shelter in Evanston. Caravello stated that she had a conversation with A.P. on March 25, 1993, after A.P. had been in the emergency room. A.P. told her that her father had a long "peepee," that "doe-doe" was her father and that he had cut her "peepee" with a pair of scissors.
The State rested its case. Neither the respondent nor A.P.'s mother presented any witnesses. After considering the evidence, the circuit court found that A.P. had been physically and sexually abused and that there was a substantial risk of physical injury to her in the home of her parents. The court ultimately entered an order finding that A.P. was sexually abused by the respondent. Following a dispositional hearing, at which the court heard testimony from a DCFS caseworker, the court found that A.P.'s parents were unfit and that it was in the best interest of A.P. that she be adjudicated a ward of the court. The court ordered that guardianship of A.P. be placed in Gary T. Morgan with the right to place A.P. The court allowed scheduled visitation between A.P. and her parents to continue.
The respondent appealed the circuit court's orders and the appellate court affirmed. A.P.'s mother apparently did not appeal. The appellate court held that the circuit court did not err in finding that the respondent sexually abused A.P. because A.P. consistently identified him as her abuser. The appellate court acknowledged that the only evidence that A.P.'s father was the person who sexually abused her was A.P.'s hearsay statements to adult witnesses. Nevertheless, the appellate court found that this hearsay evidence was corroborated by medical evidence.

ANALYSIS
The respondent argues that the evidence was insufficient to support the finding that he had abused A.P. because that evidence consisted solely of A.P.'s uncorroborated hearsay statements. The respondent's contention in this regard is twofold. First, he contends that the use of A.P.'s statements to *648 support a finding of abuse violated section 2-18(4)(c) of the Juvenile Court Act (705 ILCS 405/2-18(4)(c) (West 1992)) because the statements were not sufficiently corroborated. Second, the respondent contends that A.P.'s hearsay statements were unreliable and their use to support a finding of abuse therefore violated due process.

I
We first address the respondent's argument that the use of A.P.'s hearsay statements to support a finding of abuse violated section 2-18(4)(c) because they were not sufficiently corroborated.
Section 2-18(4)(c) of the Juvenile Court Act governs the use of a minor's hearsay statements in a civil adjudicatory hearing to determine whether the minor is abused or neglected. Section 2-18(4)(c) provides:
"Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 1992).
The respondent claims that, in order for hearsay statements to support a finding of abuse, section 2-18(4)(c) requires that both the occurrence of the abuse and the identity of the abuser be independently corroborated by other evidence. In this case, the circuit court's finding of abuse by the respondent was premised on the hearsay statements of A.P. The respondent argues that these statements were not sufficiently corroborated because there was no corroboration of A.P.'s identification of him as the abuser. Consequently, the respondent contends the statements were insufficient to support a finding of abuse against him, pursuant to section 2-18(4)(c).
There is a conflict among the districts of our appellate court regarding the type of corroboration required by section 2-18(4)(c). The appellate court cases are divided on what aspects of a minor's hearsay statement must be corroborated. One district of the appellate court has held that the occurrence of the abuse and the identity of the abuser must each be specifically corroborated. In re D.P., 176 Ill.App.3d 456, 126 Ill.Dec. 29, 531 N.E.2d 162 (3d Dist.1988). Another district has held that section 2-18(4)(c) requires corroboration only of the occurrence of the abuse. In re Walter B., 227 Ill.App.3d 746, 169 Ill.Dec. 787, 592 N.E.2d 274 (1st Dist. 1992); In re C.C., 224 Ill.App.3d 207, 166 Ill.Dec. 540, 586 N.E.2d 498 (1st Dist.1991).
This conflict presents an issue of statutory construction. It is well settled that in construing a statute, we must ascertain and give effect to the intent of the legislature. See Nottage v. Jeka, 172 Ill.2d 386, 392, 217 Ill.Dec. 298, 667 N.E.2d 91 (1996); People v. Bole, 155 Ill.2d 188, 195, 184 Ill. Dec. 423, 613 N.E.2d 740 (1993). The best evidence of legislative intent is the language of the statute itself. See Nottage, 172 Ill.2d at 392, 217 Ill.Dec. 298, 667 N.E.2d 91. Legislative intent may also be discerned by a consideration of the reason and necessity for the statute, the evils to be remedied, and the object to be obtained by the statute. See Bole, 155 Ill.2d at 195, 184 Ill.Dec. 423, 613 N.E.2d 740; People v. Garrett, 136 Ill.2d 318, 329, 144 Ill.Dec. 234, 555 N.E.2d 353 (1990). We have a duty to avoid a construction of the statute that would defeat the statute's purpose or yield an absurd or unjust result. See Bole, 155 Ill.2d at 195, 184 Ill.Dec. 423, 613 N.E.2d 740; Croissant v. Joliet Park District, 141 Ill.2d 449, 455, 152 Ill.Dec. 561, 566 N.E.2d 248 (1990).
We therefore begin our inquiry into legislative intent by examining the language of section 2-18(4)(c). The first sentence allows a minor's out-of-court statements relating to allegations of abuse or neglect to be admitted into evidence at a civil adjudicatory hearing to determine whether the minor is abused or neglected. This sentence thus creates a statutory exception in the context of abuse and neglect cases involving minors to the general rule against hearsay. At issue in this case is the meaning of the second sentence, which explains when such hearsay statements are sufficient to support a finding of abuse or neglect.
*649 Under the plain language of the second sentence, a minor's hearsay statement is sufficient to support a finding of abuse or neglect where the statement either is subject to cross-examination or is corroborated by other evidence. Parenthetically, we note that the respondent does not suggest that this sentence should be interpreted to require both crossexamination and corroboration. To interpret section 2-18(4)(c) as always requiring cross-examination of the minor as a prerequisite to allowing the minor's hearsay statements to support a finding of abuse or neglect would defeat the underlying purpose of that provision. The underlying purpose of section 2-18(4)(c) is to provide a means of proving abuse or neglect in cases where the minor is reluctant or unable to testify. To require that the minor be subject to crossexamination, that is, to testify, in order for the minor's statements to be used to support an abuse or neglect finding would entirely defeat that purpose. We therefore construe the second sentence of section 2-18(4)(c) as requiring either cross-examination of the minor who made the statement or corroboration of the minor's hearsay statement. This construction comports with the purpose of the statute and best effectuates the legislative intent.
The respondent's argument with regard to section 2-18(4)(c) is directed to the amount of corroboration required under that section. The respondent contends that section 2-18(4)(c) requires both corroboration of the sexual abuse and of the identity of the abuser. We reject the respondent's contention.
Section 2-18(4)(c) is a provision contained in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 1992)). It is wellrecognized that a statute should be evaluated as a whole with each provision being construed in connection with every other section. See Bonaguro v. County Officers Electoral Board, 158 Ill.2d 391, 397, 199 Ill.Dec. 659, 634 N.E.2d 712 (1994). In section 1-2 of the Act, the legislature directed that the purpose and policy of the Act is to serve and protect the best interests of minors. 705 ILCS 405/1-2(1), (3) (West 1992); see In re J.J., 142 Ill.2d 1, 8, 153 Ill.Dec. 239, 566 N.E.2d 1345 (1991). In addition, the legislature instructed that the Act is to be liberally construed to carry out its purpose and policy. 705 ILCS 405/1-2(4) (West 1992). Consequently, we have a duty to construe section 2-18(4)(c) in a liberal manner so as not to defeat the purpose and policy of the Act.
In section 2-18(4)(c), the legislature sought to balance the welfare interests of minors and the rights of those accused of abuse or neglect. Specifically, as noted earlier, section 2-18(4)(c) was intended to provide a means of proving abuse or neglect where a minor is unable or unwilling to testify, such as where the minor is very young. Corroboration is particularly important given the fact that the minor who made the statement will not be subject to cross-examination. However, to interpret section 2-18(4)(c) as the respondent urges, to require specific corroboration of the identity of the abuser, would tip the balance far too heavily against the interest of protecting minors. If corroboration of the identity of the accused is required, practically speaking, use of the hearsay statements to support an abuse finding will be allowed only in those rare cases where there is an eyewitness to the abuse or the abuser confesses. While a medical examination and other physical evidence can provide corroboration of the occurrence of the abuse, it is unlikely that there would be physical evidence to corroborate the identity of the abuser. Consequently, if the respondent's argument is adopted, the hearsay exception set forth in section 2-18(4)(c) would be rendered meaningless. We find that the purpose of section 2-18(4)(c) is best effectuated by requiring corroboration only of the occurrence of the abuse, not of the identity of the abuser. Requiring this amount of corroboration provides sufficient protection to the interests of those accused of abuse, without severely diminishing the welfare interests of the minor. We therefore reject the respondent's argument that section 2-18(4)(c) requires specific corroboration of the identity of the abuser.
Accordingly, we hold that hearsay statements of a minor admitted pursuant to section 2-18(4)(c) may be sufficient to support a *650 finding of abuse or neglect as long as there is corroboration that the abuse or neglect occurred. It is not necessary to independently corroborate the identity of the perpetrator. There is sufficient corroboration of the identity of the perpetrator when there is corroboration of the occurrence of the abuse or neglect and the minor consistently identifies the perpetrator. Once abuse or neglect is corroborated by independent evidence, it lends credence to the minor's recitation of the incident, including the identification of the perpetrator. This interpretation of section 2-18(4)(c) best effectuates the purpose and policy of the Juvenile Court Act, by protecting both the rights of those accused and the welfare of minors.
Of course, whether there is sufficient corroboration under section 2-18(4)(c) is a determination that must be made on a case-by-case basis. However, in all cases, sufficient corroboration of the abuse or neglect requires more than just witnesses testifying that a minor related claims of abuse or neglect to them. Because the term "corroboration" is not defined in section 2-18(4)(c), we rely on its plain and ordinary meaning. "To corroborate" means to add weight or credibility to a thing by additional and confirming facts or evidence, and "corroborating evidence" means evidence supplementary to that already given and tending to strengthen or confirm it. See Black's Law Dictionary 344-45 (6th ed.1990). Accordingly, in the context of section 2-18(4)(c), corroborating evidence of the abuse or neglect requires there to be independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred. In essence, corroborating evidence is evidence that makes it more probable that a minor was abused or neglected. The form of corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence.
We next address whether there was sufficient corroboration of A.P.'s hearsay statements regarding the sexual abuse. As noted in the facts, A.P.'s hearsay statements are the source of proof that A.P. was abused by the respondent. Here, the witnesses relating A.P.'s hearsay statements were subject to cross-examination; however, A.P. was not subject to cross-examination because she did not testify at the proceedings. Nevertheless, the hearsay statements made by A.P. are admissible in evidence and, if corroborated, will support the circuit court's finding of sexual abuse.
We find that A.P.'s hearsay statements that she was sexually abused were sufficiently corroborated by the medical evidence. In her medical examination of A.P., Dr. Blade observed that A.P. had an abnormal hymen. The hymen was stretched past its point of elasticity and torn and its opening was larger than normal for a girl her age. This finding indicated to Dr. Blade that A.P. had suffered a prior trauma. Dr. Blade determined that A.P.'s vagina had been penetrated. Dr. Blade ruled out the possibility of penile penetration. Instead, she opined that A.P.'s vagina had been penetrated by the insertion of either a finger or a foreign object. After considering her findings, Dr. Blade diagnosed A.P. as having been sexually abused at least two weeks prior to her examination of A.P. on April 1, 1993. This finding by Dr. Blade establishes the time of the abuse to be in March of 1993 or earlier. At this time, A.P. was living with her mother and the respondent. We find that Dr. Blade's testimony corroborated A.P.'s hearsay statements. The medical evidence introduced by Dr. Blade corroborated A.P.'s description of the abuse. In addition, Dr. Blade rendered a medical opinion that A.P. was sexually abused. We reject the respondent's claim that the medical evidence was weak and insufficient to support the abuse. The respondent claims that Dr. Blade acknowledged on cross-examination that it was just as likely that A.P. caused her own injuries or that they were caused by a fall. Although Dr. Blade did testify that anything was possible, she further stated that it was highly unlikely that A.P. caused the injuries herself or that the injuries were sustained during a fall. After specifically considering these possibilities, Dr. Blade continued to maintain that A.P. was sexually abused.
After considering the medical evidence, we find that it constitutes sufficient corroboration *651 of A.P.'s hearsay statements because it makes it more probable that A.P. was sexually abused. Thus, pursuant to section 2-18(4)(c), A.P.'s hearsay statements are sufficient to support a finding of abuse by the respondent.

II
The respondent also argues that he was denied due process of law because the finding of abuse against him was based on hearsay statements by A.P. that were not sufficiently reliable. The respondent contends that A.P.'s hearsay statements were unreliable because the identification of him as the abuser was not corroborated by independent evidence. As we held in section one of this analysis, corroboration of the abuser's identification is not required under section 2-18(4)(c). We are not persuaded that the lack of corroboration of the abuser's identity renders the statements so unreliable that their use violates due process. The respondent also claims that A.P.'s hearsay statements are unreliable because they are inconsistent and contradictory. We disagree.
The totality of the circumstances surrounding the making of A.P.'s statements indicates that the statements were sufficiently reliable to be used to support a finding of abuse. A.P.'s statements to adults that she was sexually abused by her father were spontaneous, repeated and consistent. The statements were not made in response to any questioning of A.P. Rather, A.P. spontaneously offered the statements to Michelle Weber. A.P. repeated the statements several times to Michelle and then again to Jennifer Daniels. Further, A.P.'s accounts of the abuse were consistent as to both the act and as to the identity of the abuser.
The respondent claims that A.P.'s statements were unreliable because they contained inconsistencies. The respondent refers to Jennifer Daniels' testimony that A.P. claimed to have never seen the respondent's penis; however, Ann Caravello testified that A.P. told her that the respondent had a long "peepee." Moreover, Michelle Weber stated that A.P. told her that the respondent was "inside her belly button." In addition, the respondent points out that Jennifer Daniels testified that A.P. told her that the respondent had hit her "peepee" with a knife whereas Ann Caravello stated that A.P. indicated that the respondent had cut her "peepee" with scissors. The respondent claims that these statements show a lack of consistency and contradiction in the manner of abuse. We reject the respondent's interpretation of A.P.'s statements. A.P. never stated that the respondent abused her with his penis. A.P. stated to Jennifer Daniels that the respondent pulled her nightgown over her head when he hurt her. This fact could provide the reason for the minor discrepancy in A.P.'s statements regarding the object that was inserted into her vagina. Nevertheless, these minor inconsistencies do not require us to find that A.P.'s statements as a whole were inconsistent, as advocated by the respondent, given that the statements were clear and consistent in the fact of the abuse and A.P.'s identification of the respondent as the abuser.
The respondent further claims that A.P. may have been manipulated into lying by her mother's family, who disliked him because he is an African-American while they are Caucasians. In support of this claim, the respondent notes that an allegation of sexual abuse made by A.P. against the respondent, two years earlier, was determined to be unfounded. We disagree that the evidence demonstrated that A.P. had a motive to lie. The respondent's contention in this regard is purely speculative. Moreover, with regard to the prior allegation of abuse, this circumstance was brought to the attention of the circuit court, which nonetheless found A.P.'s statements to be reliable. There is no indication in the record that A.P. fabricated her current statements or was coached to do so by her mother's family. To the contrary, A.P.'s statements were spontaneously given.
In light of the foregoing factors, we reject the respondent's contention that A.P.'s statements were too unreliable to be used to support a finding of abuse. A.P.'s hearsay statements identifying the respondent as her abuser have been shown to be reliable. The circuit court therefore did not infringe on the respondent's constitutional right to due process by relying on A.P.'s statements to support *652 a finding of sexual abuse against the respondent. Parenthetically, we note that the respondent attempts to bring this case within the purview of United States Supreme Court decisions which address the requirements that the confrontation clause imposes on the admissibility of hearsay statements in criminal cases. See Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). The respondent acknowledges that this is not a criminal case, but argues that these cases should be applied because he has been found to have committed conduct that could lead to criminal charges. We need not decide whether the confrontation clause requirements must be satisfied in this noncriminal setting because, even if those requirements applied, we would find them to be satisfied. Based on the analysis above, we would find that the totality of the circumstances surrounding the making of A.P.'s statements provides sufficient "particularized guarantees of trustworthiness" such that A.P.'s hearsay statements possess adequate "indicia of reliability." See Wright, 497 U.S. at 819-23, 110 S.Ct. at 3148-51, 111 L.Ed.2d at 655-57.
Aside from the respondent's claims regarding the reliability of A.P.'s statements, he further contends that he was deprived of his right to due process because the petition for adjudication did not identify him as the abuser. The respondent insists that he was therefore prevented from defending himself and it was unfair for the trial court to subsequently identify him as the abuser. This contention is without merit. Although the State did not initially name the respondent as the abuser in its petition, it joined the public guardian's request following the adjudicatory hearing that the respondent be identified as the abuser. The respondent was not deprived of the opportunity to defend himself, given that he was on notice throughout the adjudicatory hearing that A.P. accused him of sexually abusing her. It was clear throughout the proceedings that A.P. did not name anyone as her abuser other than the respondent. Although fully aware that A.P.'s allegations of sexual abuse were directed at him, the respondent chose not to present evidence to rebut those allegations. Therefore, the respondent was not denied due process on this basis.

III
As a final matter, we consider whether the evidence was sufficient for the circuit court to find that the respondent abused A.P. and was therefore unfit as a parent. The proceedings in this case are civil in nature such that a finding of abuse need only be supported by a preponderance of the evidence. 705 ILCS 405/2-18(1) (West 1992). The circuit court's finding on whether abuse or neglect occurred will not be disturbed on appeal unless contrary to the manifest weight of the evidence. See In re Stilley, 66 Ill.2d 515, 520, 6 Ill.Dec. 873, 363 N.E.2d 820 (1977).
In this case, the circuit court's finding of sexual abuse against the respondent was based on A.P.'s statements. We have already determined that those statements were both independently corroborated and reliable. The circuit court was in the best position to determine the credibility and weight of the witnesses' testimony and to resolve conflicts in their testimony because the circuit court had the opportunity to observe their demeanor and conduct. See In re Stilley, 66 Ill.2d at 520, 6 Ill.Dec. 873, 363 N.E.2d 820. Based on the testimony of A.P.'s relatives, caseworkers, and doctor, as discussed above, we find that the circuit court's decision was not against the manifest weight of the evidence. A.P.'s actions toward a doll, reliability of her statements identifying the respondent as her abuser, and the findings of her doctor support the circuit court's finding that the respondent sexually abused A.P. Given that A.P. was sexually abused by her father, the circuit court properly determined that A.P. was an abused minor and that the respondent was an unfit parent. 705 ILCS 405/2-3(2)(iii), 2-27 (West 1992).

CONCLUSION
For the reasons stated, we affirm the judgment of the appellate court affirming the juvenile court's finding that the respondent *653 was an unfit parent because he sexually abused A.P.
Affirmed.