# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re J.S.*, 2013 IL App (3d) 120744

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.S. and R.S., Minors (The People of the State of Illinois Petitioner-Appellee, v. Dawn R., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-12-0744 |
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed | June 6, 2013<br><br>July 31, 2013<br>July 31, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The facts presented to the trial court in the case of a neglect petition were sufficient to support the adjudication order finding that respondent's children were neglected because of an environment that was injurious to their welfare, since the evidence established that respondent failed to protect her children from her boyfriend. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, Nos. 12-JA-77, 12-JA-78; the Hon. Mark E. Gilles, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Louis P. Milot, of Peoria, for appellant. |

Jerry Brady, State's Attorney, of Peoria (Terry A. Mertel and Judith Z. Kelly, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion. Justices Carter and Lytton concurred in the judgment and opinion. |

**OPINION**

¶ 1    The trial court found J.S. and R.S. neglected on the basis of an injurious environment. Respondent, Dawn R., the mother of the two children, appealed. For the reasons that follow, we affirm.

¶ 2                                                    FACTS

¶ 3    On April 19, 2012, petitions were filed in the circuit court alleging that J.S. and R.S. were neglected minors by reason of an injurious environment. The petition with regard to J.S. alleged:

"A) On March 5, 2012, J.S., who is 13, but is cognitively delayed and functions at a 2nd or 3rd grade level, reported that respondent's paramour, Michael Tucker, put his finger in her mouth and tried to put his penis in her mouth and that Mr. Tucker also masturbated in front of her and the minor told DCFS of these incidents and later on March 8, 2012, when the police spoke to J.S., she would only report that Mr. Tucker placed his finger in her mouth and that she was told to 'stick to the story' and when respondent was questioned about coaching the minor, respondent denied it, following this on March 9, 2012, respondent admitted that she had told J.S. to lie regarding the sexual abuse and that respondent did this because Mr. Tucker had been violent in the past to her and threatened to kill someone if he went to jail; and

B) Respondent remained with Mr. Tucker and allowed him to reside with the minors even though he had been violent to respondent in the past."

The petition with regard to R.S. alleged:

"A) On March 5, 2012, his sibling, J.S., who is 13 but is cognitively delayed and functions at a 2nd or 3rd grade level, reported that her mother's paramour, Michael Tucker, put his finger in her mouth and tried to put his penis in her mouth and that Mr. Tucker also masturbated in front of her and the minor also told DCFS of these incidents

-2-

and later on March 8, 2012, when the police spoke to J.S. she would only report that Mr. Tucker placed his finger in her mouth and that she was told to 'stick to the story' and when respondent was questioned about coaching the minor, respondent denied it, following this on March 9, 2012, respondent admitted that she had told J.S. to lie regarding the sexual abuse and that respondent did that because Mr. Tucker has been violent in the past to her and threatened to kill someone if he went to jail; and

B) Respondent remained with Mr. Tucker and allowed him to reside with the minors even though he has been violent to respondent in the past."

¶ 4 At the adjudicatory hearing, Jill Williamson testified that she was a classroom aide and J.S. was one of her students. J.S. was 12 years old, but communicated and functioned at a lower level than most 12-year-old children. Williamson acknowledged that J.S. would occasionally get things "mixed up." On March 5, Williamson asked J.S. how her weekend was, to which J.S. responded "not good." When asked why, J.S. said that her dad had come into her room the previous night and put his finger in her mouth and his "thing" inside her. As she was telling Williamson what happened, J.S. pointed to her crotch and said "you know that thing that boys have." Then J.S. said "I should be mad, right?" and said "I'm mad and I'm not going to call him dad anymore. I'm going to call him Mikey." Williamson understood Mikey to be respondent's boyfriend whom J.S. called dad and who lived with them. Williamson had met Mikey twice when he brought things to school for J.S. Williamson ended the conversation, returned J.S. to her classroom, told the teacher what was going on, and called for the school counselor.

¶ 5 On March 7, J.S. told Williamson that her mom (respondent) was really mad and had slapped J.S. in the face and told J.S. that she needed to tell a lie. J.S. said to Williamson: "My mom told me I need to lie and that this is all my fault."

¶ 6 Lonna Spurgeon, an investigator for the Department of Children and Family Services (DCFS), testified that she conducted two interviews with J.S. She talked with J.S. about respondent's boyfriend, whom J.S. referred to as Mikey. J.S. told Spurgeon that he had come into her room when she was sleeping and that he put his fingers on her mouth, and then in her mouth, and told her to close her eyes when he put his fingers in her mouth. Spurgeon asked J.S. whether this was the truth or this was a story and J.S. responded that it was a story. When asked why she was telling a story, J.S. responded that if she stuck to the story she would get a gift from respondent. Spurgeon testified that J.S. appeared confused at times during the interview. At the subsequent interview, J.S. told Spurgeon that Mikey had not touched her in any way she did not like and that he did not put his finger in her mouth.

¶ 7 Leigh Rittenhouse, an investigator for DCFS, testified that she interviewed J.S. at school on March 5. J.S. told her that her dad, Mike, the night before had come into her room and tried to stick his "thing" in her mouth but she kept her mouth closed. She said he stuck his finger in her mouth and told her to suck on it. J.S. demonstrated that Mikey was masturbating. Later that day, Rittenhouse went to respondent's home, notified respondent of the report, and told her that because Michael Tucker was still living in the home, DCFS needed to implement a safety plan. Respondent stated that the allegations were "bullshit, that Mikey is never alone with the children." Respondent, however, did agree to the safety plan

and said that Michael would leave the home.

¶ 8    Rittenhouse again later spoke with respondent. Rittenhouse told respondent about J.S.'s statement of saying she had to stick with the story and that if she did so she would get a gift. Respondent said she did not tell her daughter what to say and that the gift must be that they were talking about going out for lunch after the interview. Respondent denied that she had talked to J.S. at all about the accusation J.S. had made. When Rittenhouse arrived at work the next day, March 9, she listened to a voicemail she had received. Respondent identified herself and Rittenhouse recognized respondent's voice on the voicemail. Respondent was crying, telling Rittenhouse she was right, that respondent did tell J.S. not to say anything at the interview because respondent was afraid of Mikey, that he was violent, and that Mikey said if he goes to jail someone is going to die.

¶ 9    Rittenhouse then called respondent, again recognizing respondent's voice on the telephone, and respondent reiterated that she had told J.S. not to say anything about what had happened because she, respondent, was afraid of Mikey. She said that he was threatening and violent and that in the past he had been physically, mentally, emotionally, and sexually abusive to respondent. She further admitted that she had spoken to J.S. about the allegations, and that J.S. had told her that Mikey tried to put his penis in her mouth. She further said that her daughter was not a liar. Finally, respondent said that she had been abused as a child and her mother did nothing to protect her and she did not want to do that to her own daughter.

¶ 10    An adjudication order was entered on July 16, 2012, reflecting that the State had proven that J.S. and R.S. were neglected by reason of an environment that was injurious to their welfare. A dispositional order was entered on August 20, 2012, making J.S. and R.S. wards of the court. DCFS was appointed guardian of the children. Respondent appeals the circuit court's neglect finding.

¶ 11                                                     ANALYSIS

¶ 12    On appeal, respondent challenges that the trial court's neglect findings were against the manifest weight of the evidence. In a neglect proceeding, the State must prove an allegation of neglect by a preponderance of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). The trial court's determination of neglect will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). A determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident, or if the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d at 498.

¶ 13    Recently, the supreme court in *In re A.P.*, 2012 IL 113875, ¶ 22, discussed the terms "neglected" and "injurious environment":

    "[A] neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare. [Citation.] Generally, neglect is defined as the failure to exercise the care that circumstances justly demand. *** [Citation.] This does not mean, however, that the term neglect is limited to a narrow definition. [Citation.] As this court has long held, neglect encompasses wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific

-4-

circumstances, and its meaning varies as the context of surrounding circumstances changes. *** [Citations.] Similarly, the term injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity. [Citation.] Generally, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. [Citations.]" (Internal quotation marks omitted.)

¶ 14    With these principles in mind, we turn to the instant case. J.S. independently reported sexual abuse to her classroom aide. J.S. subsequently told her classroom aide that respondent told her that it was her fault and that she will need to lie about the incident with Mikey. J.S. later left out the sexual allegation, while being interviewed by DCFS, telling the interviewer instead that Mikey had only put his finger in her mouth. J.S. also told the interviewer that she was there to tell a story and that if she stuck to the story she would get a gift from respondent. Following the interview, respondent denied having talked to J.S. about the allegations at all and specifically denied telling J.S. what to say. However, the next morning, respondent left a voicemail, and then confirmed in a follow-up telephone call that she had in fact told J.S. not to say anything at the interview because she was afraid of Mikey. We believe these facts support a finding that respondent failed "to exercise the care that [the] circumstances justly demand[ed]" and "ensure a safe and nurturing shelter for her *** children." *In re A.P.*, 2012 IL 113875, ¶ 22.

¶ 15    While respondent calls attention to the fact that J.S. would often get things "mixed up" and appeared "confused" while being interviewed, we note that the count "A)" of the neglect petition was not grounded upon J.S.'s allegation that Mikey abused her. Instead, it was based upon the injurious environment that J.S. was being subjected to as a result of respondent's failure to protect her after the allegation was made. Even if we were to accept respondent's argument with respect to count "A)," however, we note that respondent's failure to remove Mikey from the home after he allegedly exhibited violence toward her in the past represents a separate and independent failure on respondent's part "to ensure a safe and nurturing shelter for *** her children." *In re A.P.*, 2012 IL 113875, ¶ 22. The neglect petition is supported by the manifest weight of the evidence.

¶ 16    In coming to this conclusion we reject respondent's reliance on *In re A.P.*, 179 Ill. 2d 184 (1997). *A.P.* involved the question of whether the minor's hearsay statement was sufficiently corroborated by other evidence. Again, the issue in the instant case does not directly involve J.S.'s allegation. Here, the neglect/injurious environment derives from respondent's behavior after the allegation was made and respondent's failure to remove Mikey from the home.

¶ 17                                    CONCLUSION

¶ 18    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 19    Affirmed.