2025 IL App (1st) 232134

FIFTH DIVISION
February 21, 2025

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-23-2134

| | | |
|---|---|---|
| *In re* M.T. and J.M., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 20 JA 30 |
| v. | ) | 20 JA 31 |
| | ) | |
| S.M.A., | ) | Honorable |
| | ) | Kimberly Lewis, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Mitchell and Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1     After an adjudication hearing, the trial court in this case found that the minor, M.T., had been sexually abused by her stepfather, S.M.A. Based on that finding of sexual abuse, it also found that she and her half-sister J.M., a minor who also lived in the same home, were abused and neglected due to an injurious environment and substantial risk of physical injury. Both minors were adjudged wards of the court. S.M.A. has appealed, arguing that (1) the trial court's findings of sexual abuse and neglect were improperly based solely on the out-of-court statements of M.T., which were not sufficiently corroborated pursuant to section 2-18(4)(c) the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-18(4)(c) (West 2018)), and (2) the trial court erred in qualifying

M.T.'s therapist as an expert and accepting her opinion testimony as partial corroboration of M.T.'s out-of-court statements. For the reasons that follow, we find that there was sufficient corroboration and that the trial court properly allowed M.T.'s therapist to testify as an expert and provide some of the corroboration for M.T.'s out-of-court testimony.

¶ 2                                    I. BACKGROUND

¶ 3     On January 8, 2020, the State filed two petitions for adjudication of wardship. The first petition alleged that M.T., born March 30, 2009, was neglected, pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2018)), and abused, pursuant to section 2-3(2) (ii)and (iii) of the Act (*id.* § 2-3(2)(ii), (iii)). The second petition alleged that J.M., born July 9, 2019, was neglected, pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), and abused, pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)). The factual basis for both petitions' allegations was that M.T. had been sexually abused by S.M.A., her stepfather and J.M.'s putative father. The minors' mother is not a party to this appeal.

¶ 4     At the adjudicatory hearing, which began on March 13, 2023, the State proceeded first by way of a stipulation as to the expected testimony of two investigators from the Illinois Department of Children and Family Services (DCFS) and a nurse who examined M.T. the day after she was first alleged to have been sexually abused. The parties also stipulated to the foundation for the second of two victim-sensitive interviews with M.T. and the translation of that interview from Spanish into English.

¶ 5     The first investigator was Jose Herrera. His stipulated testimony was that, on May 1, 2019, he went to M.T.'s school to investigate a DCFS hotline call that alleged sexual molestation and substantial risk of sexual abuse. When he met with her, M.T. reported to Mr. Herrera that she and her younger brother, A.T., and their stepfather, S.M.A., had been at the house the afternoon before,

on April 30, 2019, while her mother was at work. Her brother had gone upstairs to get some fruit from their aunt. M.T. said it was during this time that "the incident" happened. No one else was home and her brother did not see what occurred.

¶ 6    That same day, Mr. Herrera spoke with M.T.'s mother, who had not known about any allegation of sexual abuse. When Mr. Herrera reported the alleged abuse, she agreed to a safety plan that included S.M.A. moving out of the house and having no contact with the children. The investigator then spoke to S.M.A., who "appeared confused but cooperative," and said he would do whatever M.T.'s mother had agreed to.

¶ 7    According to Mr. Herrera's stipulated testimony, on May 21, 2019, M.T. participated in a victim-sensitive interview that did not disclose any sexual abuse by S.M.A. Mr. Herrera then had a conversation with S.M.A. in which S.M.A. acknowledged that he was home with the children the afternoon of April 30, 2019, but denied ever touching M.T.'s private parts or harming her.

¶ 8    On May 30, 2019, Mr. Herrera spoke with M.T.'s mother and with S.M.A. about terminating the safety plan and having S.M.A. move back into the home. Mr. Herrera visited the home for the last time on June 18, 2019, and, at that time, he was told that S.M.A. mostly lived outside the home but helped M.T.'s mother with transportation to doctors' appointments, laundry, or errands. The children told Mr. Herrera on that visit that they felt safe with their mother. Mr. Herrera made a finding that abuse and sexual abuse were indicated and closed his investigation.

¶ 9    The second investigator was Sofia Salas. According to her stipulated testimony, she investigated a second DCFS hotline call on or about November 14, 2019. On November 15, 2019, she then met with M.T., who reported that S.M.A. lived in the home and he had looked at her in a "funny way" that made her feel uncomfortable. That same day, a safety plan was made that required S.M.A. to leave the home until M.T. completed a forensic interview. M.T. told Ms. Salas

3

that she felt ready to talk about the incident that had occurred between her and S.M.A. "months ago."

¶ 10    Ms. Salas also spoke with M.T.'s younger brother, A.T., and observed his victim-sensitive interview. In that interview, A.T. said that M.T. told him and his mother that S.M.A. had touched M.T.'s "private parts." A.T. told Ms. Salas that S.M.A. had never touched him.

¶ 11    Ms. Salas observed a second victim-sensitive interview with M.T. on December 13, 2019. When Ms. Salas reported to M.T.'s mother that, during the second interview, M.T. reported being sexually penetrated by S.M.A., M.T.'s mother said she would not allow S.M.A. to return to the home. Ms. Salas also made an indicated report of sexual abuse and substantial risk of sexual abuse.

¶ 12    The stipulated testimony of the emergency room nurse who examined M.T. on May 1, 2019, was that she did not observe any signs of sexual abuse, but that "the visual examination of the child's genitals was limited."

¶ 13    In her second victim-sensitive interview, on December 13, 2019, M.T. described in detail two separate incidents in which she was sexually abused by S.M.A. and said that there were no other incidents. The first incident she described took place during an afternoon. Her brother had gone upstairs to get strawberries from their aunt while M.T. remained alone with S.M.A. M.T. said that she went into her mother's room and S.M.A. came in and touched her over her clothes in her "private parts." He told her not to tell anyone. She told her teacher the morning after it happened. She thought this incident took place on a Tuesday in September. She said that she told her teachers about that incident the next morning at school.

¶ 14    M.T. said she thought the second incident happened before the one she had described as happening in September. In this incident, she was asleep in her mother's room—her mother worked nights so was not at home—and "woke up a bit" because, she said, "I had like a-a pil-

pillow on top of my head and then later I saw that my stepfather was touching me." He touched both her front and back "private parts" with "his part" which "he used to go the bathroom." She felt his "part" go "in" both the front and back private parts at different times and he was moving very fast and very slow, at different times. This touching was under her clothes. Her stepfather did not have clothes. It felt "really bad."

¶ 15 According to M.T.'s recounting of these incidents in the victim-sensitive interview, they happened while she was living in two different places, but she was unclear as to exactly where each incident occurred. At one point in the interview, she said that she only told her teachers about the first incident. Later, she said that the touching stopped "[a]fter the second time when I told my teacher after they called the-the-the police and everything stopped." She gave the following information in the interview about where her brother was for each incident:

"Q. You told me that on that occasion your brother was there also?

A. On the second.

Q. On the second time, okay.

A. Yes, I think he was there but I think (inaudible).

Q. In the second time?

A. Yes, (inaudible).

Q. Oh okay, okay. Where was your brother the first time?

A. He was in the house but then he went with my aunt when she called him.

Q. Okay—the first time when your stepfather touched you was your brother with your aunt?

A. No, the second time.

Q. Okay.

A. My brother was sleeping.

Q. Okay, the first time your brother was sleeping?

A. Yes."

¶ 16    On May 4, 2023, the State called Valerie Cifuentes, a therapist employed by the Children's Advocacy Center, to testify. Ms. Cifuentes testified that she had a master's degree in social work, focused on child development, from the Erickson Institute. Previously, she had worked for seven years as an "intact worker." She had no specialty certification attached to her degree.

¶ 17    Ms. Cifuentes began providing therapy to M.T. around July 2020. She described her treatment of M.T. and M.T.'s behavior, then began to testify about her conversations with M.T. as to the petition allegations. When the State asked whether she had an opinion based on her treatment of and conversations with M.T., the parents' attorneys objected. In response, the State argued that Ms. Cifuentes was an expert in psychology and social work. At that point, the State had not given the parents' attorneys Ms. Cifuentes's curriculum vitae or listed her as an expert. The court recessed proceedings and ordered the State to provide Ms. Cifuentes' curriculum vitae to the parents and then, at a later court date, ordered that the parents be allowed to depose her.

¶ 18    The parents then moved *in limine* to limit Ms. Cifuentes's testimony. After a hearing on that motion, the court ruled that Ms. Cifuentes had sufficient education and experience in the field to be a therapist and thus be qualified as an expert in "social work" and "child trauma therapy." The court also said that it would give her testimony its appropriate weight. The court continued to overrule the parents' renewed objections to Ms. Cifuentes's qualifications as an expert and to her being allowed to testify to her opinion.

¶ 19    Ms. Cifuentes was recalled and testified that, while working at the Children's Advocacy Center, she was trained in what she described as modalities, including eye movement

desensitization and reprocessing and cognitive behavioral therapy. Ms. Cifuentes acknowledged that she had no training in knowing whether a trauma victim is telling the truth and that she had not yet sat for her licensed clinical social worker examination.

¶ 20    Ms. Cifuentes explained that she used the modalities she was trained in while treating M.T. and that M.T.'s responses to those therapies, were, in her opinion, consistent with her being a child abuse victim. Ms. Cifuentes testified that M.T. identified her stepfather as perpetrating sexual abuse and that she believed M.T. was the victim of sexual abuse. Ms. Cifuentes testified that M.T. had classic symptoms of post-traumatic stress disorder. She experienced disassociation, had intrusive thoughts, and was hypervigilant. Ms. Cifuentes could not even discuss the abuse with M.T. for a year-and-a-half because M.T. would completely dysregulate if Ms. Cifuentes tried to raise the topic.

¶ 21    On October 27, 2023, the court entered its adjudication orders, finding that the State had met its burden of proving by a preponderance of the evidence that M.T. and J.M. were both neglected due to an injurious environment and abused due to a substantial risk of injury. The court also found M.T. was sexually abused and named S.M.A. as the perpetrator of this sexual abuse.

¶ 22    The court acknowledged that the physical examination of M.T. after her first report of sexual abuse did not reveal physical evidence of assault but noted that, according to the stipulation, the exam was "limited." The court relied on the victim-sensitive interview in which M.T. described the encounters with S.M.A. "in great detail" and "in her own words." The court also relied on the prior indicated reports and M.T.'s repetition of the report of abuse "during her therapy sessions with Ms. Cifuentes, whom the court did deem an expert giv[en] her experience and education." The court noted Ms. Cifuentes's testimony that M.T. would "retreat inside her body" and "shut down." The court also observed that there was no evidence that M.T. had a motive to lie or to

7

fabricate her reports of abuse.

¶ 23    The same day the court entered the adjudication orders, it entered dispositional orders adjudging both minors wards of the court.

¶ 24                                      II. JURISDICTION

¶ 25    The trial court entered its dispositional orders in this matter on October 27, 2023. Those orders encompassed the court's findings, made that same day, that the minors were neglected and abused. In child protection cases, an adjudicatory order is generally not considered a final and appealable order; rather, it is the dispositional order that is regarded as final and appealable as of right and "the proper vehicle to appeal a finding of abuse or neglect." *In re Barion S.*, 2012 IL App (1st) 113026, ¶ 36. S.M.A timely filed his notice of appeal on November 13, 2023. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments in civil cases, and Illinois Supreme Court Rule 660 (eff. Oct. 1, 2001), governing appeals in cases arising under the Act.

¶ 26                                      III. ANALYSIS

¶ 27    The Act establishes a two-step process for determining whether a minor should be made a ward of the court: (1) the adjudicatory hearing, where the trial court must decide " 'whether the minor is abused, neglected or dependent,' " and (2) the dispositional hearing, where—if there has been a finding of abuse, neglect, or dependency—"the trial court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *In re Z.L.*, 2021 IL 126931, ¶¶ 58-60 (quoting 705 ILCS 405/2-18(1) (West 2018)). S.M.A has challenged only the adjudicatory findings.

¶ 28    S.M.A. raises two closely related issues on appeal: he contends that the trial court's findings of abuse and neglect must be reversed because they were based on hearsay statements

purportedly made by M.T., for which there was insufficient corroborating evidence, and that the court erred in qualifying Ms. Cifuentes as an expert and accepting her opinion testimony as part of the corroboration of M.T.'s statements.

¶ 29    The burden is on the State to prove allegations of abuse or neglect by a preponderance of the evidence; in other words, that "the allegations are more probably true than not." *Id.* ¶ 61. We will not disturb a trial court's finding of abuse, neglect, or dependency unless it is against the manifest weight of the evidence. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 37. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Z.L.*, 2021 IL 126931, ¶ 61.

¶ 30    The Act contains a specific provision regarding out-of-court statements by a minor. Under section 2-18(4)(c) of the Act, "[p]revious statements made by the minor relating to any allegations of abuse and neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2022). Our supreme court has explained what constitutes sufficient corroboration under this statute:

> "[I]n the context of section 2-18(4)(c), corroborating evidence of the abuse or neglect requires there to be independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred. In essence, corroborating evidence is evidence that makes it more probable that a minor was abused or neglected. The form of corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence." *In re A.P.*, 179 Ill. 2d 184, 199 (1997).

The supreme court also made clear in *A.P.* that "there is sufficient corroboration of the identity of

the perpetrator when there is corroboration of the occurrence of the abuse or neglect and the minor consistently identifies the perpetrator." *Id.* at 198.

¶ 31   We will first consider S.M.A.'s argument that the court should not have allowed Ms. Cifuentes to testify as to her opinion that M.T. was abused so that we can determine whether that can be relied on for part of the corroboration.

¶ 32   Illinois Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." And, as our supreme court has explained:

> "Illinois law does not impose any explicit requirements as to the level or extent of experience, education, scientific study, or training that is required to qualify a witness to offer expert testimony on a subject. [Citation.] In determining whether such testimony is proper, the relevant question is whether the witness has knowledge and experience beyond the average citizen that would assist the jury in evaluating the evidence." *People v. Pingelton*, 2022 IL 127680, ¶ 56.

The decision whether to allow an expert to present certain opinions is within the discretion of the trial court. *In re Commitment of Holt*, 2022 IL App (1st) 210402, ¶ 56. We will find the admission of testimony to be an abuse only where "no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 33   S.M.A. argues that Ms. Cifuentes had no training or expertise that qualified her to testify as to whether M.T. was telling the truth or that would help determine whether M.T. was sexually abused by S.M.A., which was the relevant question in this case. However, Ms. Cifuentes did have experience and training in treating children with trauma, and the trial court made clear that it was

only giving Ms. Cifuentes's testimony the weight and consideration it deserved. The court specifically focused on Ms. Cifuentes's testimony that M.T.'s "accounts" and "body language" were consistent with child abuse and that this was "based on [Ms. Cifuentes's] experience and dealing with children and her training in dealing with children." It was certainly not an abuse of discretion to consider this as permissible expert testimony that could be relied on to corroborate M.T.'s out-of-court accounts of sexual abuse. It does not appear that the court considered Ms. Cifuentes's opinion about M.T.'s credibility, and, thus, we need not consider whether it was proper to consider her an expert on that issue.

¶ 34    This is very different from the expert testimony at issue in *In re Custody of Brunken*, 139 Ill. App. 3d 232, 240 (1985), relied upon by S.M.A. In that case, the experts testified generally that the child's symptoms as described by the child's mother were consistent with sexual abuse. In this case, Ms. Cifuentes herself observed M.T.'s behavior when discussing the incidents that had occurred with S.M.A. It was based on both her own observations and her expertise that she was able to testify that M.T.'s symptoms and responses were consistent with being sexually abused.

¶ 35    S.M.A. also argues that the trial court erred in allowing admission of the testimony because Ms. Cifuentes did not offer any opinions "to a reasonable degree of certainty." S.M.A. offers nothing to suggest that Ms. Cifuentes lacked certainty or based her opinions on conjecture or speculation. Rather, he appears to be arguing that Ms. Cifuentes failed to incant those words. However, "there is no magic to the phrase itself." (Internal quotation marks omitted.) *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 28 (2008). "If the [expert's testimony] reveals that his or her opinions are based upon specialized knowledge and experience and grounded in [scientific, medical, architectural, etc.] thought, it is of no consequence that the witness has failed to preface the opinions with the phrase, *within a reasonable degree of certainty.*" (Emphasis in

original and internal quotation marks omitted.) *Id.* The failure of Ms. Cifuentes to use those specific words does not support S.M.A.'s claim that the trial court abused its discretion in admitting this testimony.

¶ 36    There was also other corroborating evidence. As our supreme court made clear in *A.P.*, 179 Ill. 2d at 199, corroborating evidence can take many forms. Corroborating evidence may come from the fact that a young victim has described physical acts of sexual abuse in a detailed fashion that would be unexpected of a child her age. *In re Alexis H.*, 401 Ill. App. 3d 543, 562 (2010). In this case, M.T. described two incidents—different from each other and each in some detail—about how S.M.A. touched her, how he moved, and how it felt. As S.M.A. points out, there were some inconsistencies in M.T.'s description as to where she was living when each incident occurred, where her brother was, and which incident occurred first. However, the details that she provided on the sexual conduct remained consistent and, more significantly, were clearly beyond what would have been expected of a 10-year-old child, her age at the time of her second victim-sensitive interview. This detailed description corroborated her out-of-court statements that she was the victim of sexual abuse. And the fact that M.T. reported the abuse to both her brother and her teachers further corroborated her out-of-court statements.

¶ 37    In light of Ms. Cifuentes's testimony that M.T.'s conduct in therapy was consistent with her being the victim of sexual abuse, the details regarding the sexual acts, and the outcries to both her brother and her teachers, we cannot find that the trial court erred in finding sufficient corroboration for M.T.'s out-of-court statements of abuse.

¶ 38    S.M.A. relies on *In re Marriage of Flannery*, 328 Ill. App. 3d 602, 614 (2002), where this court held that "testimony regarding the physical manifestations that accompany a child's hearsay statements of abuse is insufficient to corroborate the out-of-court statements when the child's

12

conduct is the only corroborative evidence presented." However, *Flannery* is quite different than this case. *Flannery* involved the application of section 8-2601 of the Code of Civil Procedure (735 ILCS 5/8-2601 (West 2000)) to determine whether out-of-court statements of a three-year-old girl were admissible in a case where an order of protection was sought against her father. *Flannery*, 328 Ill. App. 3d. at 604-06. In addition to corroboration for an out-of-court statement to be admissible, section 8-2601 also requires that the court find the statements reliable at a preadmission hearing, which the trial court in that case had not conducted. *Id.* at 608-09. This court found that, in *Flannery*, there was no need to remand for a reliability hearing because the only corroboration the trial court had pointed to was the girl's "physical manifestations" when she related the allegations of sexual abuse, which consisted of pointing to her private parts and saying that her father had hurt her there. *Id.* at 612-13. As this court noted, this pointing was itself hearsay and was not independent evidence that could corroborate her out-of-court statements that her father had abused her. *Id.* at 614. While a social worker in that case conducted a sexual-abuse-victim assessment, that witness was not qualified as an expert and simply related the child's conduct and statements during the assessment. *Id.* at 613.

¶ 39    In this case, in contrast, M.T.'s out-of-court statements were corroborated by the expert testimony of Ms. Cifuentes, based on her expertise and training in child trauma therapy, that M.T. exhibited symptoms of having been the victim of sexual abuse. These "physical manifestations" included disassociation, intrusive thoughts, hypervigilance, and dysregulation and were not simply M.T. pointing to her private parts. In addition, M.T. was able to describe details of the abuse that the three-year-old in *Flannery* could not. *Flannery* is simply not the same as this case.

¶ 40                                    IV. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the circuit court's dispositional orders, adjudging

these minors wards of the court, and its underlying adjudicatory orders, finding M.T. sexually abused and finding both M.T. and J.M. neglected due to an injurious environment and abused due to a substantial risk of injury.

¶ 42    Affirmed.

---

**_In re M.T._, 2025 IL App (1st) 232134**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 20-JA-30, 20-JA-31; the Hon. Kimberly Lewis, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Suzanne A. Issacson, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Carrie Fund, of counsel), guardian _ad litem_. |