2021 IL App (2d) 210306-U
No. 2-21-0306
Order filed November 3, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* J.C., S.C. and G.C., Minors | ) | Appeal from the Circuit Court |
| | ) | of Boone County. |
| | ) | |
| | ) | Nos. 18-JA-7 |
| | ) | 18-JA-8 |
| | ) | 18-JA-9 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Janet R. Holmgren, |
| Appellee v. Juan C., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the trial court's finding of unfitness pursuant to section 1(D)(m)(ii) of the Adoption Act based on respondent's conduct during the first nine-month period following the adjudication of neglect.

¶ 2   On October 11, 2018, the trial court adjudicated the children, J.C. (born in 2013), S.C. (born in 2015), and G.C. (born in 2017), neglected. Respondent, Juan C., had been charged with first-degree murder for the stabbing death of the children's mother, K.A. At all times relevant, respondent has been in jail pending an outcome in the criminal case. Nearly eight months following the adjudication of neglect and, thus, eight months into the first nine-month period

following the adjudication of neglect, the trial court changed the goal from reunification to substitute care pending determination of parental rights.

¶ 3    On May 13, 2021, after the completion of four nine-month periods and upon hearing the State's petition, the trial court terminated respondent's parental rights. The court found respondent to be unfit under section 1(D)(m)(ii) of the Adoption Act, determining that respondent failed to make reasonable progress toward the return of the children during each of the nine-month periods following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2018). The court further determined that it was in the children's best interest to terminate respondent's parental rights.

¶ 4    Respondent now appeals the finding of unfitness only, raising both a question of statutory interpretation and a sufficiency claim. We reject respondent's arguments. We focus on the first nine-month period, as the failure to make reasonable progress during any *one* of the nine-month periods is a sufficient basis upon which to terminate respondent's parental rights. See *id*. We determine that respondent can be found unfit under section 1(D)(m)(ii), which measures a parent's reasonable progress toward the return of the child, even though the trial court changed the goal eight months into the first nine-month period from return home to substitute care. We also determine that the trial court's finding of unfitness was not against the manifest weight of the evidence. Accordingly, we affirm.

¶ 5                                I. BACKGROUND

¶ 6                              A. Initial Proceedings

¶ 7    On July 13, 2018, respondent and K.A. engaged in a physical altercation resulting in K.A.'s death by stabbing. Respondent also suffered stab wounds and was unconscious when police arrived but was subsequently revived and sent to the hospital. Respondent's wounds were thought

to be self-inflicted. The three minors were found in a back bedroom. They were home when the stabbing occurred. Respondent was ultimately arrested and charged with first-degree murder.

¶ 8     On July 17, 2018, the State filed neglect petitions on behalf of the three children, alleging that their environment was injurious to their welfare. 705 ILCS 405/2-3(1)(b) (West 2018). The trial court found probable cause of neglect. It entered a temporary custody order to the Department of Children and Family Services (DCFS), authorized DCFS to place the minors in care, and ordered that any visitation between respondent and the minors be supervised.

¶ 9     On August 2, 2018, the trial court held a status hearing. There, the court specified that DCFS was authorized to place the minors in relative care or traditional foster care.

¶ 10    On August 8, 2018, DCFS, who had temporary custody of the children, determined that visitation between respondent and the children was not appropriate. The agency noted that respondent was in jail and was charged with first-degree murder for the death of the children's mother, the children were very young, and the children were traumatized. The issue of visitation would be reassessed in the future. In the meantime, respondent would be permitted to write the children letters and, if the content was appropriate, the agency would deliver them to the children.

¶ 11          B. Proceedings Occurring During the First Nine-Month Period:
                    October 11, 2018, to July 11, 2019

¶ 12                     1. Adjudicatory Hearing

¶ 13    On October 11, 2018, the trial court conducted the adjudicatory hearing. The State called Sergeant Edward Kriegar of the Boone County Sheriff's office to testify to the July 13, 2018, crime scene. The court determined that Kriegar's testimony established by a preponderance of the evidence that a serious incident of domestic violence had occurred in the children's home. The court noted that there had been no sign of forced entry into the home and that the circumstance of respondent being found unconscious on top of K.A. led to the reasonable conclusion that the

- 3 -

altercation had been between respondent and K.A. only. The court further determined that the children were present at the time of the incident, which placed them at risk of harm. The court adjudicated the minors neglected.

¶ 14                                    2. Dispositional Hearing

¶ 15    On December 6, 2018, the trial court conducted the dispositional hearing. The State stipulated to reports issued by the agencies with whom DCFS worked, the Children's Home and Aid Society and the court appointed special advocate (CASA). Those reports provided as follows. In a September 3, 2018, report, respondent stated that he "did what he did" (*i.e.*, kill K.A.) to protect the children. K.A. appeared to be in an "altered" state at the time. Respondent himself had been drinking and taking Tylenol on the day of the incident. Respondent entered into a romantic relationship with K.A. while in a stepfather relationship to her. (Separately, respondent's older biological daughters, not at issue in this case, were currently accusing him of sexual abuse.) Based on reports of drug use during the incident and early romantic interactions with K.A. that were inappropriate, DCFS recommended that respondent complete a substance abuse evaluation and a sex offender evaluation. Although respondent had been given permission to write the children letters, "[n]o letter [has] been written by [respondent] to this day." A September 24, 2018, report showed that respondent completed the integrated assessment. The information given by respondent during the assessment was "highly suspect." For example, respondent reported that he met K.A. on the street when she was 22 years old. However, other family members had confirmed that respondent had been in a stepfather relationship with K.A. since she was one year old, and they suspected that he groomed her for a romantic relationship. Caseworkers viewed pictures of respondent standing beside K.A. at her high school graduation when she was 18 years old. Respondent was reported to be very controlling, and K.A. sought an order of protection against

respondent the day before her death. A November 28, 2018, report stated that DCFS continued to recommend no visitation with the father. Finally, a December 6, 2018, report repeated much of the same and again reported that respondent had not yet written letters to his children. Without expressly referring to a permanency goal, the report provided that the prognosis toward reunification was not good.

¶ 16     Respondent testified that he wished for certain members of his family to care for his children, and he provided three names. The caseworker, Mercedes Sanchez, testified that one of the individuals had been ruled out because she minimized the impact of the events on the children. Sanchez did not have enough information to run a background check on a second individual, and respondent had not before provided the name of the third individual. The court again adjudicated the children neglected, finding respondent unfit, unwilling, or unable to care for them. It checked a box that stated that the permanency goal, presumably reunification (with the prognosis being poor), remained appropriate. It instructed that DCFS would have guardianship and custody, with "discretion to place in foster care only." We affirmed the dispositional order on appeal, rejecting respondent's argument that the court's directive to place the children in foster care only was unduly specific. *In re J.C.*, 2019 IL App (2d) 190006-U, ¶ 26.

¶ 17                                  3. First Permanency Review Hearing

¶ 18     On May 30, 2019, the trial court conducted the first permanency review hearing. This hearing occurred seven months and 19 days after the October 11, 2018, adjudication of neglect. The parties stipulated to the agency reports. A May 16, 2019, DCFS permanency hearing report rated respondent's progress as unsatisfactory. Respondent was supposed to have completed a mental health and substance abuse assessment. However, at a screening in January 2019, Sanchez was uncertain of the validity of respondent's answers. Sanchez wanted to check respondent's

answers against other documentation, such as medical records from the day of the altercation, but respondent would not sign the consents necessary to release the records. Sanchez attempted to visit respondent in jail each month. Beginning in January, respondent consistently refused to meet with Sanchez, even though the goal set in the service plan required respondent to see or speak with a caseworker "at least" monthly. Additionally, respondent had not engaged in parenting or domestic violence classes. He was unable to secure an income or maintain stable housing. However, he did begin sending letters to his children. In the report, DCFS recommended two, inconsistent permanency goals. First, it recommended return home within 12 months. Later in the report, it advised that the return home goal was not in the best interests of the children.

¶ 19    No additional evidence was submitted. The State rested on the reports. Respondent's counsel asked the court to find that respondent had made reasonable efforts and progress. He noted that respondent had sent the children letters. He argued that, even if respondent were to complete the various evaluations, he would have limited access to services while in jail. He further noted that the medical records sought by the caseworker were likely available to the State in the criminal proceedings: "I actually think there is a good possibility that those medical records and substance abuse records that the agency is even looking for the State may already have those, so I'm—at least in the criminal case, they are obtainable."

¶ 20    The court determined that DCFS had made reasonable efforts. It determined that respondent had not made reasonable efforts or reasonable progress, even accounting for respondent's status as an inmate in jail. It concluded: "I do not believe that the goal of return home is appropriate under the circumstances. I would set a permanency goal at substitute care pending the Court's determination of parental rights."

¶ 21    C. Proceedings Occurring During the Second, Third, and Fourth Nine-Month
Periods: July 11, 2019, to October 11, 2021

¶ 22                          1. Second Permanency Review Hearing

¶ 23    On October 31, 2019, the trial court conducted a second permanency review hearing. The court again found that respondent had not made reasonable efforts or reasonable progress. The court explained: "I realize he is incarcerated and cannot undertake any services. It's been consistent until very recently that he blocked the caseworker from attempting to even engage in treatment services and then tries to negotiate engagement." The State asked the trial court if it could delay filing a petition to terminate parental rights. It wanted to wait until a decision was rendered in respondent's criminal trial, which it believed would occur in Spring 2020. The trial court agreed and, thus, the permanency goal remained substitute care pending determination of parental rights.

¶ 24                          2. Third Permanency Review Hearing

¶ 25    On June 4, 2020, the trial court conducted a third permanency review hearing. The court determined that DCFS had made reasonable efforts. The court also determined that respondent had not made reasonable efforts or reasonable progress, noting that he had not been cooperative or engaged in any services. The parties reported that a decision had not yet been rendered in respondent's criminal case. The court expressed concern that the children remained in limbo but continued the goal to be substitute care pending determination of parental rights.

¶ 26                          3. Fourth Permanency Review Hearing

¶ 27    On November 5, 2020, the trial court conducted a fourth permanency review hearing. The court again determined that DCFS had made reasonable efforts and that respondent had not made reasonable efforts or progress. Respondent, for the first time, expressed a willingness to sign various consents and releases that were necessary to initiate his participation in services. However, he requested a protective order prohibiting any information that was subsequently obtained from

being used in his criminal proceedings. The court agreed to enter a protective order. The court again expressed concern that the children were in limbo as respondent's criminal case remained pending. It continued the goal to be substitute care pending determination of parental rights.

¶ 28                              4. Fifth Permanency Review Hearing

¶ 29      On March 18, 2021, the trial court conducted a fifth permanency review hearing. The court again determined that DCFS had made reasonable efforts and that respondent had not made reasonable efforts or progress. The court acknowledged that respondent had "just finally" signed the releases as requested by DCFS, but it explained that this alone did not provide a sufficient basis to modify the goal of substitute care pending determination of parental rights.

¶ 30                              D. Termination Proceedings

¶ 31      On January 7, 2021, the State moved to terminate parental rights. It alleged, *inter alia*, [1] that respondent was an unfit parent pursuant to section 1(D)(m)(ii) of the Adoption Act, in that he failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2018). The nine-month periods at issue were: (1) October 11, 2018, to July 11, 2019; (2) July 11, 2019, to April 11, 2020; (3) April 11, 2020, to January 11, 2021; and (4) January 11, 2021, to October 11, 2021.

¶ 32                              1. Unfitness

---

[1] Initially, the State set forth a second ground of unfitness, depravity. 750 ILCS 50/1(D)(i) (West 2018). However, the State dismissed that ground prior to the termination hearing, presumably because it had not yet secured a conviction in the underlying criminal case. See, *e.g.*, *In re Brandon K.*, 2017 IL App (2d) 170075 (2017) (a conviction for first-degree murder creates a rebuttable presumption that the parent is depraved).

¶ 33    On May 13, 2021, the trial court conducted the termination hearing, beginning with the unfitness portion. The State submitted the earlier agency reports. Sanchez was the only witness to testify. She testified consistent with the information provided at the permanency review hearings. In addition, she testified as follows.

¶ 34    As to the first nine-month period (and just prior thereto), Sanchez testified that, after DCFS created the initial service plan, which was dated August 18, 2018, they brought it to respondent in the jail. Sanchez read it page by page to respondent, and respondent was provided a Spanish-speaking translator. Sanchez asked respondent to sign an acknowledgement that he had received the service plan, and he refused. On January 8, 2019, DCFS generated a "graded report." The report graded respondent as unsatisfactory in many of his goals, such as cooperation, completion of parenting classes, and assessments for substance abuse, domestic violence, and sex offender status. Although respondent signed some consents necessary to initiate services, he did not date them. He subsequently refused to sign the required consents such that his ability to be assessed for services was stalled. Sanchez was not able to review the January 2019 graded report with respondent because he refused to see her. Sanchez visited respondent monthly at the jail, and he refused to see her from January 2019 to May 2019. On June 20, 2019, respondent agreed to see Sanchez again. At that time, she was able to review the January 2019 graded report. However, respondent refused to sign an acknowledgement that he had received the January 2019 report. Sanchez then went over the new, May 2019 graded report. Respondent did not follow along, and he refused to sign an acknowledgement that he had received that report. Respondent told Sanchez that his criminal attorney told him not to sign anything. Sanchez informed respondent that these forms were merely acknowledgements; she was not asking him to admit to any crime. Respondent persisted in his refusal to sign the forms.

¶ 35    As to both the second and third nine-month periods, respondent also refused to sign consents necessary to be assessed for domestic violence services and medical releases necessary to discuss the case with potential providers.

¶ 36    As to the third nine-month period, DCFS ceased in-person jail visits due to the COVID 19 pandemic.  DCFS mailed the updated and graded reports to respondent and talked with respondent over the phone.  Respondent signed one consent.  (Again, at the November 5, 2020, review hearing, which occurred during the third nine-month period, respondent had indicated that he would do so.) This consent enabled him to participate in an assessment with the Rosecrance substance abuse treatment program.

¶ 37    As to both the third and fourth nine-month periods, respondent began treatment with Rosecrance over the phone.  Rosecrance then informed Sanchez that it was not able to provide further services without records from respondent's hospitalization, and respondent again refused to sign the appropriate consents.

¶ 38    During cross-examination, Sanchez testified the jail did not provide substance abuse services for respondent, but Rosecrance did.  Other requirements of the service plan, such as domestic violence services, and sex offender evaluations, were not provided by the jail.  Similarly, respondent would not be able to maintain housing, because he was in jail.

¶ 39    The trial court determined that respondent was unfit pursuant to section 1(D)(m)(ii).  It stated:

> "Based upon the testimony of [Sanchez] regarding her interactions with [respondent], as well as the documents, the service plans, *** and the other documents in the pendency of this case, at the unfitness portion the [c]ourt finds that *the evidence is overwhelming* that [respondent] has not made reasonable progress on any of his service

plan goals, and I would agree with the State's position that his refusal to execute consents and cooperate with assisting the case workers in trying to link him with services was a contributing factor to that lack of progress. So[,] by clear and convincing evidence, I do find [respondent] unfit." (Emphasis added.)

¶ 40                                    2. Best-Interests

¶ 41    The trial court continued to the best-interest hearing. There, the foster mother testified that she is a homemaker and her husband is an auto-mechanic. The foster parents have two biological children who are now adults living independently. They have cared for J.C., S.C., and G.C. in their four-bedroom home since September 2018. There is one other foster child in the home, a nine-year-old girl. All of the children play together and consider each other siblings. The foster mother feels that she has provided all of the children with love, stability, trust, and fun. She and her husband are willing to adopt the children and provide them with a permanent home. The trial court found that the foster parents are "meeting and exceeding" the children's needs. It determined that it was in the best interest of the children to terminate respondent's parental rights and allow for adoption. This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43    On appeal, respondent challenges the trial court's finding of unfitness under section 1(D)(m)(ii) of the Adoption Act. First, he argues that, as a matter of law, he cannot be found to be unfit under section 1(D)(m)(ii), which measures a parent's reasonable progress toward the return of the child during a nine-month period following the adjudication of neglect, when the goal set at the first permanency review hearing was something other than return home. Next, he argues that the trial court's finding of unfitness was against the manifest weight of the evidence. A failure to make reasonable progress during any one of the nine-month periods following the adjudication

of neglect is sufficient to sustain a finding of neglect on that ground (750 ILCS 50/1(D)(m)(ii) (West 2018)) and we focus on the first nine-month period.

¶ 44    Parents have a fundamental liberty interest in the care, custody, and management of their children. *In re D.T.*, 212 Ill. 2d 347, 363 (2004). Nevertheless, the trial court has the authority to terminate parental rights involuntarily; that authority is grounded in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2018)) and the Adoption Act. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The Adoption Act provides that it shall be construed in conjunction with the Juvenile Court Act. 750 ILCS 50/2.1 (West 1998). The purpose of the Juvenile Court Act is to ensure that the best interests of the minor, the minor's family, and the community are served. *In re C.N.*, 196 Ill. 2d 181, 209 (2001). It is in the interests of children to receive prompt, just, and final resolution of their status rather than to remain in limbo. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 45    The Juvenile Court Act provides a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018); *J.L.*, 236 Ill. 2d at 337. At the first stage, the court must find, by clear and convincing evidence, that the parent is unfit as defined by section 1(D) of the Adoption Act. *J.L.*, 236 Ill. 2d at 337. Section 1(D) sets forth several discrete grounds for finding a parent unfit. *In re C.W.*, 199 Ill.2d 198, 217 (2002). Although the State may rely on several grounds for unfitness in its petition to terminate parental rights, a finding adverse to the parent on any one ground is sufficient to support a subsequent termination. *Id*. At the second stage, the court must find that it is in the best interest of the child to terminate the parent's rights. *Id*. at 337-38. The standard of proof at the best interest stage is a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 366.

¶ 46    In this case, respondent challenges the findings of unfitness pursuant to section 1(D)(m)(ii) of the Adoption Act. That section provides:

"(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act. If a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987. Notwithstanding any other provision, when a petition or motion seeks to terminate parental rights on the basis of item (ii) of this subsection (m), the petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on." 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 47 In *C.N.*, the supreme court examined the reasonable progress provision at length. It began by observing that "progress" is ordinarily defined as movement or advancement toward a goal. *C.N.*, 196 Ill. 2d at 211. It reasoned that the goal in section 1(D)(m) is "return of the child." *Id.*; see also 750 ILCS 50/1(D)(m)(ii) (West 2018) (reasonable progress toward the "return of the child"). It then determined that the benchmark against which to measure a parent's progress toward the return of the child was as follows:

"[T]he benchmark for measuring a parent's progress under section 1(D)(m) of the Adoption Act must take into account the dynamics of the circumstances involved; the reality that the condition resulting in removal of the child may not be the only, or the most

severe, condition which must be addressed before custody of the child can be returned to the parent; the appropriate role of service plans in addressing these conditions; and the overriding concern that a parent's rights to his or her child will not be terminated lightly. Accordingly, we hold that the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent. *** [C]ompliance with DCFS service plans is intimately tied to a parent's progress toward the return of the child, so much so, that where a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress now includes the failure to 'substantially' fulfill the terms of that service plan." *Id.* at 216-217.

¶ 48    A service plan, in turn, "must reasonably relate to remedying the conditions that gave rise, or that could give rise, to any finding of child abuse and neglect." *In re Neveah R.*, 2017 IL App (2d) 170229, ¶ 23 (citing *C.N.*, 196 Ill. 2d at 215). Additionally, mindful that a child is not to remain in limbo forever, reasonable progress toward the return of the child means that a court will be able to return the child to the parent's custody *in the near future*. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. Reasonable progress is an objective standard. *Id.* It is not concerned with a parent's personal circumstances which may have impeded a parent's ability to make reasonable progress. *Id.* ¶ 89. As such, while incarceration alone is not evidence of failure to make reasonable progress, incarceration can impede progress toward the goal of reunification. *Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21.

¶ 49                                    A. Statutory Interpretation

¶ 50     We now turn to the precise question of statutory interpretation posed by respondent: As a matter of law, is the trial court precluded from finding respondent unfit under section 1(D)(m)(ii), which measures a parent's reasonable progress toward the return of the child, when the goal set at the permanency review hearing is something other than return home?  Looking at the first nine-month period in particular, respondent argues that that his "progress or lack of progress [can] only be measured during the first seven months [and 19 days] after adjudication because the goal which began as return home at adjudication was changed to substitute care pending [determination] of parental rights."  For the reasons that follow, we reject respondent's argument.

¶ 51     When interpreting a statute, the primary objective is to ascertain and give effect to the intent of the legislature.  *J.L.*, 236 Ill. 2d at 339.  The best indicator of legislative intent is the language of the statute.  *Id.*  The statute must be read as a whole, with each provision being construed in connection with the other relevant provisions of the statute.  *Id.*; *In re A.P.*, 179 Ill. 2d 184, 197 (1997).  When the statutory language is clear and unambiguous, the language will be given effect as written, without resort to other principles of statutory interpretation.  *J.L.*, 236 Ill. 2d at 339.  We may not depart from the plain language of the statute "by reading into it exceptions, limitations, or conditions the legislature did not express."  *Id.*

¶ 52     We also recognize that legislative intent may be ascertained by considering the reason and necessity for the statute.  *A.P.*, 179 Ill. 2d at 195.  Therefore, we should not interpret a statute so as to defeat its purpose or yield an absurd or unjust result.  *Id.*  Statutory interpretation presents a question of law, which we review *de novo*.  *J.L.*, 236 Ill. 2d at 340.

¶ 53     In support of his interpretation, respondent notes that the supreme court has defined progress as "movement or advancement toward a *goal*" and has acknowledged that the goal

identified by section 1(D)(m) is the return of the child. (Emphasis added.) *C.N.*, 196 Ill. 2d at 211. Advancement toward that return is measured, *in part*, by a parent's compliance with appropriate service plans. *Id*. at 217. Respondent then points us to section 2-28(2) of the Juvenile Court Act, which provides, *in part*, that "[w]here the court has selected a permanency goal other than [reunification with the parents] the Department of Children and Family Services *shall not provide further reunification services \*\*\* but shall provide services consistent with the goal selected*." (Emphasis added.) 705 ILCS 405/2-28(2) (West 2018). In respondent's view, it would be unfair to measure his progress toward reunification based on compliance with service plans when the goal is no longer reunification.

¶ 54    Respondent's argument is flawed, in that he reads a limitation into section 1(D)(m)(ii) of the Adoption Act that does not exist. Additionally, respondent focuses on an isolated portion of section 2-28(2) instead of reading the statute as a whole, and respondent's interpretation runs counter to the purpose of the Adoption Act.

¶ 55    Respondent reads a limitation into section 1(D)(m)(ii) of the Adoption Act that does not exist. See *J.L.*, 236 Ill. 2d at 339 (we may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express). Section 1(D)(m)(ii) of the Adoption Act does not reference the permanency review hearing or the potential goals that may be set at the permanency review hearing. If the legislature intended for section 1(D)(m)(ii) to apply only when the goal set at the permanency review hearing was return home, it could have so stated. It did not. We will not read into section 1(D)(m)(ii) a limitation that does not exist.

¶ 56    Moreover, section 2-28 does not support respondent's interpretation when read as a whole. The relevant provisions of section 2-28 provide:

"(2) *** *At the permanency hearing, the court shall determine the future status of the child*. The court shall set one of the following permanency goals:

(A) The minor will be returned home by a specific date within 5 months.

(B) The minor will be in short term care with a continued goal to return home within a within a period not to exceed one year ***.

(B-1) The minor will be in short-term care with a continued goal to return home pending a status hearing ***.

(C) The minor will be in substitute care pending court determination on termination of parental rights.

(D) Adoption, provided that parental rights have been terminated.

(E) The guardianship of the minor will be transferred to an individual or couple on a permanent basis ***.

(F) The minor over age 15 will be in substitute care pending independence ***.

(G) The minor will be in substitute care because he or she cannot be provided for in a home environment due to developmental disabilities or mental illness or because he or she is a danger to self or others ***.

In selecting any permanency goal, the court shall indicate in writing the reasons the goal was selected and why the preceding goals were deemed inappropriate and not in the child's best interest. *Where the court has selected a permanency goal other than (A), (B), or (B-1), the Department of Children and Family Services shall not provide further reunification services, except as provided in paragraph (F) of this subsection (2), but shall provide services consistent with the goal selected.*

*\*\**

> *If the permanency goal is to return home*, the court shall make findings that identify any problems that are causing continued placement of the children away from the home and identify what outcomes would be considered a resolution to these problems. The court shall explain to the parents that these findings are based on the information that the court has at that time and may be revised, should additional evidence be presented to the court.

*\*\**

> (4) *\*\** *When return home is not selected as a permanency goal*:

*\*\**

> (b) *The State's Attorney may file a motion to terminate parental rights of any parent who has failed to make reasonable efforts to correct the conditions which led to the removal of the child or reasonable progress toward the return of the child, as defined in subdivision (D)(m) of Section 1 of the Adoption Act* or for whom any other unfitness ground for terminating parental rights as defined in subdivision (D) of Section 1 of the Adoption Act exists." (Emphases added.) 705 ILCS 405/2-28 (West 2018).

¶ 57    Section 2-28(2) makes clear that its focus is the placement of the child: "At the permanency hearing, the court shall determine the future status of the child."  More importantly, section 2-28(4)(b) expressly allows the trial court to do what the respondent says it cannot: find a parent unfit under section 1(D)(m)(ii) of the Adoption Act for failure to make reasonable progress toward the return of the child when return home has not been selected as the permanency goal.  Respondent does not address section 2-28(4)(b) in either his initial brief or his reply brief.

¶ 58    In our view, section 2-28(4)(b) is dispositive.  Further, we note that respondent's interpretation is inconsistent with the purpose of the Adoption Act.  See *A.P.*, 179 Ill. 2d at 195 (we should not interpret a statute so as to defeat its purpose).  The purpose of the Adoption Act is to ensure that the best interests of the minor, the minor's family, and the community are served. *C.N.*, 196 Ill. 2d at 209.  It is in the interests of the child to receive a prompt, just, and final resolution of their status.  *D.L.*, 191 Ill. 2d at 13.  This purpose would be thwarted were we to release a parent from his obligation to make reasonable progress toward the return of his child, lest he be found unfit, merely because the goal set at the permanency review hearing was no longer return home.  For example, there is no guarantee that the parent *will* be found unfit or that the goal will not change at a subsequent permanency review hearing.  Also, the State may choose to delay the filing of the termination petition, as it did here.  Again, section 2-28(4)(b) provides that when the goal set at the permanency review hearing is something other than return home, the State *may*, but is not required to, file a termination petition.  705 ILCS 405/2-28(4)(b) (West 2018).  In any of these scenarios, releasing the parent from an obligation to make reasonable progress at any time prior to termination increases the risk that the child will be placed in continued limbo.  We conclude, as the State urges, that "the change in goal [at the permanency review hearing does] not obviate respondent's obligation to cooperate and meet the objective measurable progress toward return requirement."

¶ 59    Finally, we reject respondent's argument that it is *per se* unfair to measure a respondent's progress toward reunification based on compliance with service plans when the goal is no longer reunification.  Compliance with service plans is a significant factor to consider, but it is not the only factor.  See, *C.N.*, 196 Ill. 2d at 216-217 (failure to make reasonable progress *includes* the failure to substantially fulfill the terms of the service plan).  Rather, as noted, reasonable progress

requires the court to "take into account the dynamics of the circumstances involved; the reality that the condition resulting in removal of the child may not be the only, or the most severe, condition which must be addressed before custody of the child can be returned to the parent; the appropriate role of service plans in addressing these conditions; and the overriding concern that a parent's rights to his or her child will not be terminated lightly." *Id*. at 216. The overarching question is whether the court will be able to return the child to the parent's custody *in the near future*. *F.P.*, 2014 IL App (4th) 140360, ¶ 88. This is an objective standard that is not concerned with the personal circumstances of the parent. *Id*. ¶ 89.

¶ 60 The instant facts illustrate why it is not *per se* unfair to measure a respondent's progress toward reunification based on compliance with service plans when the goal is no longer reunification. Here, it was respondent's own failure to cooperate that prompted the goal change at the first permanency review hearing. Respondent points us to nothing in *his* service plan that changed *as a result of the goal change*. Sanchez continued to prompt respondent to sign consents so that he could start services. While there may be a case in the future where it is unfair to measure a parent's progress toward reunification based on compliance with service plans when the goal is no longer reunification, this is not that case.

¶ 61 　　　　　B. Sufficiency of the Evidence as to the First Nine-Month Period

¶ 62 Finally, we address respondent's sufficiency argument as to the first nine-month period, October 11, 2018, to July 11, 2019. Respondent argues that the evidence does not support the court's finding that he failed to make reasonable progress toward the return of the children during this period where his incarceration, pending criminal proceedings, and goal change at the first permanency review hearing impaired his ability to cooperate and participate in services. Again, while incarceration alone is not evidence of failure to make reasonable progress, incarceration can

impede progress toward the goal of reunification. *Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. We may reverse a trial court's finding of unfitness pursuant to section 1(D)(m)(ii) if it is against the manifest weight of the evidence. *Id.* ¶ 16. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.*

¶ 63    Here, the trial court's determination of unfitness pursuant to section 1(D)(m)(ii) is not against the manifest weight of the evidence. To the contrary, the evidence supports the findings that, during the first nine-month period, respondent did not provide truthful answers in response to caseworkers' questions, did not take advantage of opportunities offered, refused to sign several acknowledgements and consents, and, most critically, refused to see his caseworker for five months between January 2019 and May 2019. It was these shortcomings, rather than respondent's incarceration, underlying criminal case, or goal change that substantiated the trial court's determination that respondent had not made reasonable progress.

¶ 64    More specifically, when completing various assessments, Sanchez and other caseworkers did not find respondent to be candid or truthful. For context, just prior to the adjudication of neglect, respondent completed an integrated assessment. Respondent's answers were deemed "highly suspect," as they blatantly contradicted facts known to be true by the service providers. Respondent claimed to have met K.A. when she was 22 when, in fact, he had acted as her stepfather since she was one year old. At a January 2019 screening, which occurred within the first nine-month period, Sanchez again doubted the validity of respondent's answers. Also, respondent did not take advantage of basic opportunities; it was months before he wrote a letter to his children.

¶ 65    Respondent refused to sign several acknowledgments and consents. These consents were necessary to begin services. For context, just prior to the start of the nine-month period, in August 2018, respondent refused to sign an acknowledgment that he had received his initial service plan,

even though Sanchez visited him in jail and read it to him page by page. In May 2019, within the first nine-month period, respondent *again* refused to sign an acknowledgement that he received his graded report. Sanchez had also read this report aloud page by page. Additionally, respondent refused to sign consents to release his medical records. These consents were necessary to begin the substance abuse assessment and treatment.

¶ 66     Without citation to authority, respondent implies that signing the medical release could have jeopardized his fifth amendment rights. While a respondent in a parental termination case does have fifth amendment rights, these are not jeopardized when the service plan requires him to participate in therapy that does not require him to confess to an underlying crime. *In re A.W.*, 231 Ill. 2d 92, 107-08 (2008). The trial court reasonably determined that respondent's refusal to sign the release was due to a general unwillingness to cooperate rather than a desire to assert his fifth amendment rights. Respondent's counsel acknowledged at the first permanency review hearing that the State in the criminal case likely already had access to the medical reports. Counsel did not seek a protective order regarding other consents that respondent refused to sign until much later in the proceedings. Moreover, respondent's refusal to sign the medical release can be viewed in the context of his August 2018 and May 2019 refusal to sign the acknowledgement of service plans, which had *no* arguable bearing on his fifth amendment rights.

¶ 67     Most critically, respondent refused to see his caseworker for five months between January 2019 and May 2019. Respondent's initial service plan required him to meet with, or at least speak with, a caseworker once per month. Sanchez attempted to visit respondent in jail once per month, but respondent refused her visits. This caused a significant delay in the progression of respondent's case. Sanchez could not review respondent's January 2019 graded report with him until June 2019. The trial court was informed of respondent's lack of cooperation at the May 30, 2019, permanency

review hearing. This, along with other information contained in the reports, was a factor in the court's decision to change the goal from return home to substitute care pending determination of parental rights. It was respondent's failure to cooperate and not the mere fact of his incarceration that provided the basis for the trial court's determination of no reasonable progress during the first nine-month period. The trial court's finding of no reasonable progress during the first nine-month period was not against the manifest weight of the evidence.

¶ 68                                    III. CONCLUSION

¶ 69    For the aforementioned reasons, we affirm the termination of respondent's parental rights.

¶ 70    Affirmed.