NOTICE
Decision filed 03/23/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210345-U

NOS. 5-21-0345, 5-21-0346, 5-21-0347 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* L.J., C.C., and J.A. Jr., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Washington County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 21-JA-3, 21-JA-4, and 21-JA-5 |
| | ) | |
| J.A., | ) | Honorable |
| | ) | Daniel J. Emge, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the trial court's orders, finding that L.J., C.C., and J.A. Jr. were neglected minors, were not contrary to the manifest weight of the evidence, we affirm the court's dispositional orders making the minors wards of the State and awarding custody and guardianship to the Department of Children and Family Services.

¶ 2    J.A. (Justin) appeals from the trial court's October 12, 2021, dispositional orders. We affirm.

¶ 3                                     I. Background

¶ 4    L.J. was born on May 4, 2009. His maternal half-sister is M.J.C. (Meghan), who has been serving as his legal guardian. His biological mother allegedly lives in Vancouver, Washington. His biological father is unknown. C.C. was born on July 31, 2016. Meghan is his mother and Seth G.

(Seth) is his father. J.A. Jr. was born on November 3, 2018, and Justin is his father. Meghan, Justin, and the three minors were residing together when the Department of Children and Family Services (DCFS) received information about an incident involving L.J. At that time, C.C.'s father, Seth, did not reside with the minors, Meghan, or Justin. Meghan's case is the subject of a separate appeal and order. See *In re L.J., C.C., and J.A. Jr.*, 2022 IL App (5th) 210335-U.

¶ 5     On March 8, 2021, DCFS received a hotline call about the welfare of L.J. The reporter stated that he was transporting L.J. to the Nashville Police Department because L.J. came to him and disclosed that Meghan and Justin had been beating him daily. The reporter indicated that the last beating incident occurred on March 7, 2021, and that L.J. sustained bruising on his buttocks, thighs, and legs. L.J. reported that he had been struck with a heavy belt by both Meghan and Justin. L.J. also reported that Justin sometimes uses his hand to strike the back of L.J.'s head. The reporter made allegations to DCFS that Meghan and Justin abused methamphetamine and prescription pain pills, that it was suspected that Justin physically abused Meghan as she had been recently seen with a swollen face, and that there was an open DCFS case involving the family.

¶ 6     On March 10, 2021, the State opened a case for each of the minor children and filed petitions that each minor was neglected in that he was in an environment injurious to his welfare. 705 ILCS 405/2-3(1)(b) (West 2018). The State also alleged that L.J. was an abused minor because Meghan and Justin who were responsible for his welfare physically abused him. *Id.* § 2-3(2)(i). The State alleged that both C.C. and J.A. Jr. were abused minors because Meghan and Justin created a substantial risk of physical injury because of the physical injuries inflicted upon L.J. *Id.* § 2-3(2)(ii). The State also filed motions for temporary custody. The State noted that all three minors were in temporary custody and asked the trial court to adjudge the minors as wards of the court, to appoint DCFS as guardians of the minors, and to award temporary guardianship to DCFS.

2

The State alleged that there was an immediate and urgent necessity to protect the minors and asked that the minors be placed in shelter care. The trial court appointed counsel for Meghan and Justin while Seth hired hire private counsel.

¶ 7                                    A. Shelter Care Hearing

¶ 8        On March 23, 2021, the shelter care hearing was held. Angela Owens, a DCFS investigator, testified that she received the March 8, 2021, hotline report regarding L.J. Owens indicated that L.J. suffers from developmental delays and is "low functioning" with an Individualized Education Plan at school. Owens stated that Lisa Durzo, the on-call DCFS investigator, met with and interviewed L.J. L.J. informed Durzo that he had been upstairs in his bedroom on March 7, 2021, when Meghan and Justin came upstairs and beat him with a belt. L.J. stated that Meghan hit him 10 times, while Justin hit him 3 times. L.J. told Durzo that he did not know why his parents hit him. However, L.J. did tell Durzo that Jesse C. (Meghan's father) stopped Meghan from continuing to hit him. Owens testified that L.J. had visible injuries with bruising to his upper thigh, buttocks, arm, and a red mark on his face. The bruises were described as purple and dark blue in color and of a "good size." The Nashville Police Department took photographs of the bruising. The State introduced these photos at the shelter care hearing. L.J. also informed Durzo that Meghan and Justin made him stay in his room most of the time and only allowed him to exit his room to eat and to use the bathroom "one time." He told Durzo that Meghan and Justin only fed him ramen noodles, vegetables, and sometimes rice.

¶ 9        Owens further testified that the other two children—C.C. and J.A. Jr.—were present in the home during the incident, and thus DCFS alleged that they were at risk of harm. DCFS removed the three children from the home of Meghan and Justin.

3

¶ 10    Owens testified that she spoke with Meghan and Justin on March 9, 2021. Meghan told Owens that she did not know how L.J. received the injuries, and Owens testified that Meghan consistently told Durzo that she did not know L.J. was injured. Justin told Owens that L.J. fell down the stairs and that his injuries were connected to that fall. She did not interview Jesse C. (Jesse). A physician examined the three children, but no medical findings were presented by the State at this hearing.

¶ 11    Owens indicated that L.J. was currently placed with a nonfamilial home where his sister currently resides. C.C. and J.A. Jr. were initially placed with C.C.'s paternal grandparents, but at the date of the shelter hearing, C.C. and J.A. Jr. were placed with C.C.'s father, Seth.

¶ 12    On cross-examination, Owens testified that she believed that L.J. was interviewed on four occasions and that he provided a consistent story. Owens acknowledged that police interviewed Jesse, and that Jesse denied knowledge that L.J. was injured by his parents. Jesse also denied that he had to intervene to stop his daughter from hitting L.J. Owens agreed that there was no medical testimony to confirm that L.J.'s injuries were consistent with being struck with a belt.

¶ 13    Owens testified that DCFS had investigated Justin a year before for "abuse" in that he attempted suicide in front of a child not involved in this case. Owens indicated that DCFS has no information that Justin had previously physically abused any child, but she testified that she was aware that he had a criminal history involving physical assaults. While in the family home, Owens acknowledged that she did not attempt to locate and/or collect any belts from the home.

¶ 14    At the conclusion of the hearing, the parties stipulated to the admission of the photographs of L.J.'s bruising taken by the Nashville Police Department. The court inquired about visitation and ascertained that Meghan and Justin were having scheduled visitation with C.C. and J.A. Jr., but not with L.J. The court indicated that L.J. was consistent in the four interviews he gave, and

4

that taking his story as true, the State had met its burden of proof. The court noted that from the photographs, there was a large circular bruise on the side and back of L.J.'s right leg. However, when looking at the bruising above his knee, the red marks were in a linear pattern. Having found that the State established probable cause to believe that the three children had been neglected—L.J. because of the physical injury and C.C. and J.A. Jr. for being in the home where L.J. was harmed—the case presented a matter of immediate and urgent necessity for removal of the three children from the home during the pendency of the case. The court stated that DCFS had the authority to place the minors as well as the discretion to allow parental visitation.

¶ 15                                B. Status Hearing

¶ 16    On May 25, 2021, the adjudicatory hearing was scheduled, but was continued at the agreement of the parties. The court left the case on the docket for a status hearing.

¶ 17    Justin's attorney alerted the court to issues with visitation. Justin spoke to the court about the issues they were having, which included having other family members approved for supervision of the parental visits, making up a missed visit, visits not occurring at the scheduled time, children being brought for visits at unannounced times, and visits being shortened for no stated reasons. Meghan's attorney concurred. The attorney representing Seth, while noting that his client had different aspirations for the outcome of this case, concurred that the agency in charge of transportation was frequently late, which caused problems for Seth as well.

¶ 18    The court indicated that it would issue an order directing DCFS to comply with the previously entered visitation plan.

¶ 19                        C. Adjudicatory Hearing—Part One

¶ 20    The adjudicatory hearing was next scheduled for June 15, 2021. After a lengthy conversation between the parties and attorneys, the State indicated that it would seek to introduce

evidence to the trial court for consideration before the continuation of the adjudicatory hearing. The State proposed to introduce two recorded interviews of L.J. Officer Kim Neuner of the Nashville Police Department conducted one of the interviews. An employee at the Amy Schulz Child Advocacy Center in Mt. Vernon conducted the second interview. In addition, the State indicated that it would introduce five photographs of L.J.'s bruising taken by Officer Neuner. At the conclusion of the hearing, the court admitted the photographs and both interviews into evidence without objections from the parties. The court set the remainder of the adjudication hearing for July 6, 2021.

¶ 21    After the State's evidence was admitted, Meghan's attorney reported that the visitation and alternate supervisor issues had not yet been resolved. Meghan's attorney also informed the court that DCFS failed to notify Meghan that C.C. was diagnosed with congestive heart failure and had been taken to a children's hospital in St. Louis, Missouri. Instead, DCFS contacted the parents to advise that they would not be having visitation with their children because one child was ill. The child illness notification is how the parents learned about the hospitalization. The trial court asked Meghan and Justin if the other visitation issues had improved. Meghan indicated that they still had no consistent time for arrival of the children. The DCFS caseworker, Sara Sauerhage (Sauerhage), provided the trial court with status information on obtaining alternate family members for visitation supervision. Sauerhage indicated that Meghan's father, Jesse, did not pass the background check due to a criminal history. However, Meghan's grandmother, Margarita, passed two background tests, and Sauerhage indicated that she would speak with her to ascertain if she was willing to provide transportation for the visits and to fill out the required paperwork.

¶ 22    At the conclusion of this hearing, the trial court admonished DCFS that although it had temporary custody and guardianship of the children, the agency needed to immediately contact the parents about medical issues.

¶ 23                                D. Adjudicatory Hearing—Part Two

¶ 24    The trial court held the balance of the adjudicatory hearing on July 6, 2021. The court noted that it had received and reviewed the two recorded interviews of L.J. and the photographs of his bruises. The State declined to call any additional witnesses in its case. Meghan's attorney called Jesse. Thereafter, in rebuttal, the State called Christina G. (Christina), L.J.'s initial foster placement after his removal from the home of his parents.

¶ 25    Jesse testified that he had moved in with his daughter for three to four months in 2021. While his daughter and Justin worked, he babysat the children. On the first night that he was in their home, a Wednesday night, L.J. fell down the stairs. Jesse reported that L.J. said "ouch" and stood up. Jesse noted that L.J. did not appear to be injured.

¶ 26    On that Friday, Meghan and Justin went out, and Jesse stayed to babysit the children. He testified that Meghan and Justin returned home at around midnight, Meghan went upstairs to check on L.J. who was asleep upstairs in his bedroom, and then Meghan and Justin went to bed. C.C. and J.A. Jr. were asleep on the couch. Jesse then testified that he decided to go out and "hang out." But before he left, he went upstairs to check on L.J. Jesse testified that L.J. was awake in bed, and that he was not upset and was not crying. Jesse testified that L.J. did not tell him that night that Meghan had struck him. Jesse denied that he spoke to Christina about L.J.'s beating and that he stopped Meghan.

¶ 27    The next morning, Jesse testified that he was the first person awake in the house. He was present on Saturday, and was in the house with the children on Sunday until 6 p.m. He was not at

7

the home on Monday. He testified that he did not see any injuries on L.J.'s body, and that L.J. did not complain of injuries. On Tuesday, he received a telephone call from Nashville Police Officer Neuner on his mother's cell phone. Officer Neuner informed Jesse's mother that Meghan and Justin were in jail. Officer Neuner assured Jesse that he was not in trouble and asked him about L.J. and whether he had seen or heard L.J. being punished.

¶ 28    Jesse testified that he had never seen Meghan or Justin hit L.J. Jesse spoke of his close bond with L.J. and testified that if someone was trying to hurt L.J., he would stop the abuse.

¶ 29    Christina next testified at the hearing. She indicated that she knows Meghan because Meghan was dating Justin. Justin is the father of Christina's children. Christina testified that she also knows L.J. because his biological sister lives with her. After the incident at issue, she became L.J.'s initial foster parent.

¶ 30    Christina testified that Jesse came to her home on March 5, 2021, between 8 p.m. and 9 p.m. He stated that he wanted to kill his daughter and Justin because they beat L.J. with a belt. Jesse told Christina that the reason for L.J.'s beating was that L.J. allowed one of Christina's daughters to come into L.J.'s house earlier that day. According to Christina's testimony, Justin first beat L.J., and then Justin came downstairs and told Meghan "to deal with [her] retarded brother." Jesse told Christina that he was downstairs on the couch, and he could hear repeated slaps of the belt, and that he had to go upstairs and remove the belt from Meghan's hand. Christina admitted that she did not call the police about the beating. On Monday, L.J. came to her house, was upset, and told her what had happened. Christina did not directly call DCFS or the Nashville Police Department but notified her ex-father-in-law—who had some previous relationship or interaction with DCFS. Christina's ex-father-in-law contacted DCFS about L.J.'s abuse.

8

¶ 31 L.J. was present on the date of the hearing and was excluded from the courtroom as a possible witness. The State did not call L.J. to testify. The guardian *ad litem* also did not call L.J. to testify. The attorneys representing Meghan, Justin, and Seth also chose not to call L.J. to testify.

¶ 32 At the conclusion of the hearing, the trial court found that L.J., C.C., and J.A. Jr. were neglected or abused minors. In support of its ruling, the trial court spoke of the consistency of L.J.'s two recorded interviews. The trial court noted that the admission of photographs of L.J.'s bruises was agreed upon by all parties. The court determined that the photographs were corroborative of L.J.'s testimony about where the "whoopings" occurred on his body. Further, L.J. talked about being "whooped" by a belt. In addition, Christina testified in court that Jesse came to her home on the evening at issue and informed her that L.J. had been beaten with a belt by both Meghan and Justin. The court indicated that while Christina may have been biased against Justin, Jesse was biased toward his daughter, Meghan. The trial court stated that it found Christina's testimony more credible than Jesse's testimony.

¶ 33 E. DCFS Family Service Plan and Dispositional Court Report

¶ 34 DCFS's Family Service Plan was dated April 22, 2021. The permanency goal for the three children was to return the children home within 12 months. L.J. requested no visitation with Meghan or Justin, and DCFS was honoring that request. The three children were in foster placement and doing well. DCFS reviewed and approved Justin's service plan on May 13, 2021. His service plan included the following action steps:

1. Needs to sign information releases for all providers in order for DCFS to monitor the services provided;

2. Needs to not discontinue services without the consent of DCFS;

3. Needs to participate in a mental health assessment and follow all treatment recommendations in order to learn effective coping strategies to maintain positive mental health and address his history of trauma;

9

4. Needs to participate in regularly scheduled visits with his child;

5. Needs to cooperate with service providers who supervise and document visits with his child;

6. Needs to provide a nutritious snack or meal at the visit to demonstrate his ability to provide for his child's nutritional needs;

7. Needs to engage his child in age-appropriate play during visits to support his child's further social, physical, and educational development;

8. Needs to engage in a therapeutic parenting intervention to learn and demonstrate effective childrearing techniques and the importance of medical and well-child check-ups and effective age-appropriate discipline techniques;

9. Needs to obtain a substance abuse assessment and follow all provider recommendations;

10. Needs to submit to random drug screens, including urine and hair follicle testing;

11. Needs to schedule and engage in an anger management assessment and follow all treatment recommendations from that provider to learn how to effectively communicate his emotions;

12. Needs to allow the DCFS worker access to the home for scheduled and unannounced visits;

13. Needs to notify DCFS of any change in household members, address, or phone numbers;

14. Needs to keep rental or mortgage payments current and provide monthly documentation of payment to DCFS;

15. Needs to maintain a safe home;

16. Needs to keep utilities paid and to provide monthly documentation of payment to DCFS;

17. Needs to maintain a clean home; and

18. Needs to schedule a psychiatric consultation to discuss his medication regimen and his mental health symptoms and follow all treatment recommendations of the psychiatrist, including taking the medication as prescribed.

¶ 35    On September 20, 2021, DCFS filed its dispositional report with the trial court. DCFS reported that it referred Justin to ComWell Behavioral Health Services (ComWell) or Chestnut Health Systems for all services indicated within his service plan. DCFS reported that Justin "completed his open access on August 31, 2021 at ComWell and has an intake scheduled for substance use at ComWell on September 20, 2021." The "open access" process was the completion of paperwork for the agency. DCFS stated that Justin reported that he had been diagnosed with posttraumatic stress disorder and bipolar disorder, and that he had a significant history of childhood trauma. DCFS indicated that Justin would benefit from mental health treatment in the form of cognitive behavioral therapy or Eye Movement Desensitization and Reprocessing therapy. DCFS found that Justin had called ComWell to complete his open access registration on June 2, 2021, but that Justin had not followed ComWell's policy of in-person completion of paperwork, and his case was closed on July 6, 2021. In March 2021, when the children came into care, Meghan and Justin were in the process of moving to a house in Okawville next door to home of Meghan's grandmother. As of the date of the report, the couple had moved into this Okawville house. Justin has been employed by a local construction company since 2010. Justin had supervised visitation with J.A. Jr. He is scheduled for one supervised visit with an outside agency each week and two additional supervised visits with Meghan's grandmother, Margarita, who DCFS approved to supervise. Meghan attended 13 of the 33 visits, with many cancellations due to the unavailability of Margarita and due to a Covid quarantine situation with an agency driver. Additional cancellations occurred because of sickness in the foster family household, and Justin's scheduled DCFS-mandated assessment appointment. DCFS indicated that its caseworker, Sauerhage, had asked Meghan and Justin for names of additional friends or family willing to supervise visits. As of the date of the report, Meghan and Justin had not provided additional names to DCFS.

11

¶ 36    On October 8, 2021, DCFS filed a dispositional report with the court. As of that date, Justin cancelled and rescheduled his substance use intake appointment at ComWell for October 11, 2021. DCFS indicated that Justin had not made service plan progress on parenting classes, mental health treatment, anger management classes, and obtaining a psychiatric consultation. DCFS found that the Okawville house was fine but noted that DCFS required proof that the utility payments were being made. DCFS noted that Justin maintained contact with the agency.

¶ 37                                    F. Dispositional Hearing

¶ 38    On October 12, 2021, the trial court held the dispositional hearing. The attorneys for Meghan and Justin informed the court that the children had been out of the family home since March 2021, but DCFS did not make referrals for assessments until September 2021. Thus, Meghan and Justin had no ability to work toward return of the children to their home.

¶ 39    The State called DCFS child welfare specialist, Sauerhage, to testify. She testified that the children were healthy and doing well in their placements. L.J. was placed in a Nashville home, while C.C. and J.A. Jr. were both placed in a Tamaroa home with C.C.'s biological father, Seth, and his fiancée, Sahara.

¶ 40    Sauerhage testified that parenting classes, anger management classes, and a mental health assessment were recommended because of the nature of the allegations that brought the children into care. At the time of the hearing, Justin was only able to have visitation with J.A. Jr. one time per week supervised by an outside agency. Margarita's husband had fallen and broken a hip, and as a result, Margarita was unable to supervise the two extra visits each week. The permanency goal for L.J. and J.A. Jr. was to return home within 12 months, while the permanency goal for C.C. was to establish custody and guardianship with his father, Seth. DCFS was asking the trial court to discharge C.C. from these proceedings. DCFS was attempting to locate L.J.'s mother in

Washington and the plan would be to work with his mother toward a return home goal. L.J. informed DCFS that he did not want to return to the home of Meghan and Justin. If L.J.'s mother could not be located, DCFS's plan for L.J. was long term foster care.

¶ 41   Sauerhage acknowledged that so long as utility and rent or mortgage payments were made, the Okawville house met DCFS requirements. She also testified that there should not be any police activity at the residence.

¶ 42   Sauerhage acknowledged that she suggested ComWell as a service provider because it had an Okawville office. DCFS forwarded all paperwork to ComWell in June 2021. Sauerhage confirmed that if a parent wanted to go with a different provider, that would be allowed if the provider was licensed or certified in the service type required. Sauerhage testified that ComWell will only allow a parent to be enrolled in one service at a time, whereas Chestnut Health Systems and other similar providers allow a parent to simultaneously engage in multiple service areas.

¶ 43   Meghan next testified at the dispositional hearing. She testified that DCFS had been involved with their family "a few times prior." Meghan stated that in these earlier interactions, DCFS tested her and Justin for drugs more than three times. She testified that she and Justin got back together in September 2020, and that "things started from there all the way until the *** kids got taken." Meghan said that she tested negative on these drug tests. She denied using illegal drugs.

¶ 44   Meghan testified that she and Justin received their service plans on a date when they were in court. Sauerhage did not ask them to sign the service plans and spent between three and five minutes explaining what they needed to do to have the children returned home. Meghan stated that she decided to try to use ComWell because it was local. When she called for an appointment, ComWell advised that it had no open appointments for that month, but that they would call back if any appointments were cancelled. Meghan testified that she and Justin did not get a call back

13

from the Okawville office. So, she and Justin instead traveled to ComWell's Chester location. In addition, Meghan kept in touch with Sauerhage about their inability to get appointments. Sauerhage informed them that they could use ComWell or Chestnut Health Systems. She also asked Sauerhage about where to engage in parenting and anger management classes because those categories of classes were not offered by ComWell. Meghan testified that she never heard back from Sauerhage with options. Meghan also had questions about the psychiatric evaluation because she did not initially realize that she needed to have this evaluation. Meghan testified that she asked Sauerhage where to obtain the evaluation. Sauerhage indicated that she would send provider information to Meghan, but as of the date of the dispositional hearing, Meghan had not heard back.

¶ 45 Meghan testified that not having her children with her was difficult. She indicated that she would do whatever DCFS required to obtain the return of her children.

¶ 46 Seth's attorney asked Meghan about an incident in which Margarita was angry with Meghan and was trying to get into Meghan's house. Meghan confirmed that police arrived at the house and informed Margarita that she could not come into Meghan's house whenever she wanted.

¶ 47 Meghan explained that she would not talk to her grandmother when she was that angry. Meghan could not provide a definite date when this happened. She stated that she could not remember if this incident occurred before or after Meghan informed Seth's fiancée that Margarita could no longer supervise the visits with C.C. and J.A. Jr.

¶ 48 The guardian *ad litem* questioned Meghan on the subject matter of the previous DCFS involvement with the family. Meghan testified that she was accused of striking Justin's oldest daughter. On another occasion, Meghan and Justin were accused of "doing drugs and basically neglecting our kids."

14

¶ 49    Justin testified at the dispositional hearing. He testified that he had three biological children with J.A. Jr. being the youngest. He also has two daughters who were 18 and 16 years of age on the date of the dispositional hearing.

¶ 50    Justin testified that when he and Meghan got back together, they lived in Nashville. Someone anonymously called DCFS several times to allege that Meghan and Justin "were doing drugs or abusive or something." He indicated that he believed the source of the anonymous reports was his ex-wife. He and Meghan were drug tested three times. Justin stated that he tested negative and has been sober since January 10, 2020.

¶ 51    Justin testified that Sauerhage gave him and Meghan the service plans while at the courthouse. Sauerhage handed them each a stack of paper and they "kind of went over the four assessments we had to do" for a few minutes. Justin testified that he did not sign any DCFS paperwork.

¶ 52    Since he was presented with a service plan, Justin testified that he had tried to get appointments, and that he had conversations and messages with Sauerhage about their inability to get an appointment in Okawville. Sauerhage informed Justin that ComWell had other locations, including the one in Chester. Justin testified that he passed the drug assessment and the ComWell substance abuse counselor indicated that he did not need substance abuse treatment. Justin testified that he was scheduled for a mental health assessment later in the month. He testified about the Okawville rental house and his plan to eventually buy a home.

¶ 53    Justin testified that he was employed by Batson Construction and typically works from 7 a.m. to 4 p.m., but on occasion, he would be required to work longer hours.

¶ 54    Justin testified that it was difficult to be separated from his son. He stated his intention to do anything DCFS requires to be reunited with his son.

¶ 55 At the conclusion of the case, the trial court and the attorneys discussed whether the court should close C.C.'s case as DCFS requested. At issue was visitation with J.A. Jr. which would still require supervision. If the court closed C.C.'s case, Seth's attorney expressed his concern that DCFS would not be able to mandate supervised visitation with C.C., and DCFS then may be forced to take protective custody of C.C. again for consistency with J.A. Jr.'s case. DCFS caseworker Sauerhage indicated that DCFS had previously treated this situation as a sibling visit, and as the visit with J.A. Jr. would be supervised, C.C.'s sibling visit would also be supervised. However, Sauerhage acknowledged that this other case involved siblings in different homes, and so she needed to check with DCFS to determine if it could be done in a case where both siblings were in the same home. The guardian *ad litem* stated that he did not know how the cases of C.C. and J.A. Jr. could yet be separated.

¶ 56 Before issuing its ruling, the trial court indicated that it had reviewed the evidence presented at the hearing, the DCFS dispositional report, and took judicial notice of previous criminal, family, and order of protection court proceedings involving the parents. The court concluded that Meghan and Justin were making reasonable efforts to keep the children in the home, but that they had not eliminated the need for removal. Despite the testimony and argument about the DCFS delays in providing referrals or information about services required, the court found that the service plans were appropriate. However, the court stated that it would not require Meghan to have a substance abuse assessment. There was no evidence that she was using illegal drugs, and the court was not convinced that the assessment was needed simply because of a hearsay claim that she had used methamphetamine. Although Justin had reportedly been sober for over one year, the court acknowledged that he did have a substance abuse problem and found that DCFS's requirement that he obtain an assessment was appropriate. The court found that there was ample

testimony about the cleanliness of the Okawville home, but that the issue involved the safety of the home given the extended testimony about the beating L.J. endured in their previous home.

¶ 57       The court questioned Sauerhage about what parenting classes were DCFS-approved and where Meghan and Justin could get started on this service plan task. The court encouraged the parents to work their programs toward the reunification goal.

¶ 58       The court noted that Seth self-reported a daily marijuana use but had engaged in three substance abuse treatment sessions. The agency had allegedly discharged Seth from additional substance abuse treatment. The court noted that marijuana had been legalized in Illinois but wanted to delay ending C.C.'s case "to insure [*sic*] that his everyday use does not continue for a little bit longer before *** we entertain discharging that case."

¶ 59       The court concluded that Meghan and Justin were unfit or unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minors. The court found that it was in the best interest of the three minors to make them wards of the court and to place custody and guardianship with DCFS.

¶ 60                                    II. Analysis

¶ 61       Here, Justin appeals the dispositional orders that L.J., C.C., and J.A. Jr. are neglected minors and making them wards of the court. An adjudicatory order is not a final and appealable order. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). Instead, in juvenile cases, the dispositional order is the final order from which a party can appeal. *Id.* Accordingly, "[a]ppealing a dispositional order is the proper vehicle for challenging a finding of abuse or neglect." *In re Leona W.*, 228 Ill. 2d 439, 456 (2008). To properly perfect an appeal, an appellant must file a notice of appeal within 30 days after the entry of a final order. Ill. S. Ct. R. 303(a) (eff. May 30, 2008). The dispositional

17

order was entered on October 12, 2021. Justin filed his notice of appeal on November 5, 2021. Accordingly, we have jurisdiction to hear this appeal.

¶ 62     On appeal from a dispositional order, the reviewing court will not reweigh the evidence or reassess the credibility of the witnesses. *In re April C.*, 326 Ill. App. 3d 245, 257 (2001). We will not reverse the trial court's decision unless the findings of fact are against the manifest weight of the evidence. *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008); *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 63     A trial court uses the following two-step process to determine if a minor should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18 (citing *In re Jay H.*, 395 Ill. App. 3d 1063, 1068 (2009)). The first step is the adjudicatory hearing. *Id.* At this hearing, " 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *In re A.P.*, 2012 IL 113875, ¶ 19 (quoting 705 ILCS 405/2-18(1) (West 2010)). After the adjudicatory hearing, if the trial court concluded that the minor was abused, neglected, or dependent, the court moves to step two, which is the dispositional hearing. *In re A.P.*, 2012 IL 113875, ¶ 21 (citing 705 ILCS 405/2-21(2) (West 2010)). "At the dispositional hearing, the trial court determines whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a ward of the court." *Id.*

¶ 64     Section 2-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) provides definitions relevant to this case. A neglected minor is defined as "any minor under 18 years of age or a minor 18 years of age or older for whom the court has made a finding of probable cause to believe that the minor is abused, neglected, or dependent *** [and] whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2018). Neglect is defined as "the failure to exercise

the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re Kamesha J.*, 364 Ill. App. 3d 785, 792-93 (2006). The term "neglect" does not have a narrow definition and must take its content from the specific circumstances of each case. *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000)). " '[T]he term "injurious environment" has been recognized by our courts as an amorphous concept that cannot be defined with particularity.' " *In re A.P.*, 2012 IL 113875, ¶ 22 (quoting *In re N.B.*, 191 Ill. 2d at 346). In a general sense, the term "injurious environment" is interpreted to mean that a parent, who has a duty to ensure a "safe and nurturing shelter" for his or her children, has breached that duty. *Id.*

¶ 65    Section 2-3 of the Juvenile Court Act also provides the relevant definitions of abuse. A minor under 18 years of age whose parent or a person who lives in the same household as the minor:

> "(i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function; [or]
> (ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function[.]" 705 ILCS 405/2-3(2)(i), (ii) (West 2018).

The State must prove that a minor is abused by the preponderance of the evidence. See *In re April C.*, 326 Ill. App. 3d at 257 (citing *In re Lakita B.*, 297 Ill. App. 3d 985, 992 (1998)).

¶ 66    Section 2-27 of the Juvenile Court Act states that a minor may be adjudged a ward of the court and custody taken away from the parents if the parents "are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be

19

jeopardized if the minor remains in the custody of his or her parents, guardian or custodian." 705 ILCS 405/2-27(1) (West 2018).

¶ 67    Although the issue in *In re Arthur H.* involved neglect and not abuse, we find that the court's analysis is appropriate in this case.

> "[T]he Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are neglectful, [and] furthers the purpose and policy of the Juvenile Court Act, which is to ensure the best interests and safety of the child. [Citation.] A contrary result would lead to the unacceptable proposition that a child who is neglected by only one parent would be without the protections of the Act. Similarly, a child would have no protection under the Act if the child were neglected, but it could not be determined which parent's conduct caused the neglect. The General Assembly could not have intended such absurd results." *In re Arthur H.*, 212 Ill. 2d at 467.

See also *In re R.G.*, 2012 IL App (1st) 120193, ¶ 35 (citing *In re J.C.*, 2011 IL App (1st) 111374, ¶ 20).

Therefore, at this stage, it does not matter whether Meghan or Justin abused L.J., but only that L.J. was abused. *Id.*

¶ 68    Justin contends that the trial court erred in finding that the minors were abused or neglected by the preponderance of the evidence. He further argues that the evidence presented was insufficient to support the trial court's findings. He takes issue with the fact that the minor L.J. was not called as a witness by the State, and therefore L.J. was not subject to cross-examination. Instead, the State relied upon the two recorded interviews of L.J. and the photos depicting his bruises. Justin contends that the court should not have accepted the hearsay statements of L.J. in the recordings as establishing abuse because the statements were not effectively corroborated as required by section 2-18(4)(c) of the Juvenile Court Act (705 ILCS 405/2-18(4)(c) (West 2018)). "Corroboration is particularly important given the fact that the minor who made the statement will not be subject to cross-examination." *In re A.P.*, 179 Ill. 2d 184, 198 (1997).

20

¶ 69    The Juvenile Court Act provides rules governing the use of statements by the minor about the abuse or neglect involved in the case. Section 2-18(4)(c) of the Act provides: "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2018).

¶ 70    While the Juvenile Court Act does not define the term "corroboration," the Illinois Supreme Court stated that using the plain and ordinary meaning of the term, there must be "independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred." *In re A.P.*, 179 Ill. 2d at 199. The court went on to define the term as "evidence that makes it more probable that a minor was abused or neglected." *Id.* The precise form of corroboration depends upon the individual facts and circumstances of the case but can include physical or circumstantial evidence. *Id.* Furthermore, a minor's hearsay statements may be sufficient to support a finding of abuse or neglect if there is some corroboration that the minor was abused or neglected. *Id.* at 198. Identification of the perpetrator of the abuse or neglect by the minor is not critical. *Id.* If the abuse or neglect is corroborated by independent evidence, that corroboration lends credence to the minor's statement of the incident as well as the identity of the perpetrator. *Id.*

¶ 71    Here, the State alleged that L.J. was abused physically and that C.C. and J.A. Jr. were abused because they were at substantial risk of physical injury by living in the same home. The State also alleged the three minors were neglected in that they were living in an environment injurious to their health, safety, and welfare. To support these allegations, the State presented the trial court with two recorded interviews of L.J. during part one of the adjudicatory hearing. L.J.

21

separately told Nashville Police Officer Neuner and an interviewer at the Amy Schulz Child Advocacy Center about the beating. L.J. provided consistent details during the two interviews. To corroborate these out-of-court statements, the State presented the court with Officer Neuner's photographs of the bruising on L.J.'s buttocks and legs. The photographs and the recorded interviews were admitted into evidence. During the second part of the adjudicatory hearing, Meghan called her father, Jesse, to testify. Jesse testified that L.J. had fallen down the steps two days before the alleged beating. Jesse also testified that Meghan and Justin did not beat L.J. on the night at issue. In response, the State called Christina who testified that Jesse came to her house the night of the beating and told her that he wanted to kill Meghan and Justin for beating L.J. Jesse told Christina that Justin initially beat L.J., and then he ordered Meghan to continue L.J.'s beating. Jesse said that he could hear the belt repeatedly striking L.J., and that he went upstairs and stopped Meghan.

¶ 72 At the conclusion of the adjudicatory hearing, the court stated that L.J.'s out-of-court statements were consistent and corroborated both by the police photographs of his bruises and by Christina's testimony. The court noted the potential biases of witnesses Jesse and Christina but concluded that Christina's testimony was more credible. The court found the evidence supported its finding that the children were neglected and abused.

¶ 73 We find that corroboration of L.J.'s recorded statements with the photographs and Christina's testimony was sufficient in this case. "The trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses and, therefore, is in the best position to determine the credibility and weight of the witnesses' testimony." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001) (citing *In re A.P.*, 179 Ill. 2d at 204). Corroboration may be provided through physical or circumstantial evidence. *In re A.P.*, 179 Ill. 2d at 199; *In re An. W.*, 2014 IL App (3d)

22

130526, ¶ 63. The photographs reflected physical evidence of the abuse L.J. consistently described in his interviews. The photographs were taken by Officer Neuner and supported a logical inference that L.J. was recently beaten with a belt, as L.J. informed Officer Neuner. *In re A.P.*, 179 Ill. 2d at 198. The photographs of the bruises corroborated L.J.'s statements that Meghan and Justin beat him and constituted "evidence that makes it more probable that a minor was abused or neglected." *Id.* at 199; see also *In re Jaber W.*, 344 Ill. App. 3d 250, 258 (2003) (the court found that a caseworker and a teacher who witnessed the minor's bruise and testified to his distress was sufficient corroborative evidence and that medical corroboration was not required to rule out the alternate cause of the minor's bruise—that the minor was struck by an adult versus falling onto a wrench).

¶ 74    Justin also argues that the trial court's findings that J.A. Jr. was neglected based on living in an injurious environment was invalid because the trial court stated its verbal reasons for its ruling on the record but did not include those findings in the written form adjudicatory order.

¶ 75    At issue are the requirements of section 2-21(1) of the Juvenile Court Act, which states:

> "If the court finds that the minor is abused, neglected or dependent, the court shall then determine and put in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings. That finding shall appear in the order of the court." 705 ILCS 405/2-21(1) (West 2018).

Here, the trial court marked the form adjudicatory order indicating its conclusion that J.A. Jr. was in an environment injurious to his welfare and abused. The form order contained a section for the trial court to include its factual findings that formed the basis of its conclusion. The Washington County circuit court's number for the case associated with J.A. Jr. was 21-JA-5. The trial court's order indicated that its factual findings for the adjudicatory order in No. 21-JA-5 were included in the adjudicatory order in No. 21-JA-4—the case involving C.C. Turning to the adjudicatory order

23

in 21-JA-4, the trial court's factual findings are: "minor statements [illegible] corroborated by People's Ex. 1 and testimony of Christina G[.]"

¶ 76   Contrary to Justin's argument, the trial court clearly did indicate its factual foundation for its order. The trial court found that L.J.'s recorded statements were corroborated both by the photographs of his bruises and the testimony of Christina about her conversation with Jesse on the night of the beating. As stated in *In re J.W.*, "section 2-21(1) of the Act required the court to specify, to the extent possible, the [parents'] acts or omissions that formed the basis of its determination. The presence of the phrase 'to the extent possible' means that the legislature was aware that in some abuse or neglect cases, a court might not be able to specify the parents' act or omissions that form the basis of the court's findings. Yet, in those circumstances, the child at issue is no less abused or neglected." *In re J.W.*, 386 Ill. App. 3d 847, 855 (2008). As stated earlier in this order, the focus at the adjudicatory phase is on the child's welfare, and thus the concern is whether the child is neglected and not whether the parent is neglectful. *In re Arthur H.*, 212 Ill. 2d at 467.

¶ 77   As stated earlier in this order, "neglect" has been defined as "the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re Kamesha J.*, 364 Ill. App. 3d at 792-93. An "injurious environment" has been interpreted as including "the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *In re D.W.*, 386 Ill. App. 3d 124, 135 (2008).

¶ 78   The trial court found that the evidence was sufficiently corroborated to find that Meghan and Justin physically abused L.J. and subjected him to an injurious environment. Proof of the abuse or neglect of one minor is admissible on the issue of the abuse or neglect of other minors for whom the parents are responsible. 705 ILCS 405/2-18(3) (West 2020). If the trial court finds that the

children were living in an injurious environment, the court can proceed to confirm the removal of the children from the home without waiting to see if these children will eventually become victims. *In re D.W.*, 386 Ill. App. 3d at 138. Evidence that one child in a household has been abused, and the parents in that household are responsible for the care and treatment of all children living there, supports a finding that other minors in the home are neglected due to an injurious environment. See *In re Z.L.*, 2021 IL 126931, ¶¶ 6, 20.

¶ 79 We conclude that the trial court's written order was consistent with the legislative intent that the court attempt to specify what parental acts or omissions formed the basis of the court's finding that J.A. Jr. was abused or neglected so that the court will be informed when the case advances to the dispositional hearing. See *In re J.W.*, 386 Ill. App. 3d at 855; 705 ILCS 405/2-21(1) (West 2018). The "acts or omissions" committed by Justin were included in L.J.'s two recorded interviews, the photographs of his bruises, and in Christina's testimony that Jesse was present and knowledgeable that Justin and Meghan beat L.J. with a belt on the evening of March 5, 2021. Those exhibits and Christina's testimony were explicitly included in the trial court's factual findings and referenced as providing a foundation for the court's order.

¶ 80 Although Justin does not indicate in his brief on appeal that he is also appealing the trial court's dispositional order, we conclude that the dispositional order must also be affirmed. The trial court has wide latitude in considering any evidence that is relevant and helpful to the court's determination of a proper disposition. *In re April C.*, 326 Ill. App. 3d at 261. We find that the State established by a preponderance of the evidence that J.A. Jr. was neglected. *Id.* at 257; *In re R.S.*, 382 Ill. App. 3d 453, 459 (2008). We find no error in the trial court's dispositional findings and judgment, conclude that the findings were not contrary to the manifest weight of the evidence, and affirm the order making J.A. Jr. a ward of the court and granting custody and guardianship to

DCFS. See *In re Arthur H.*, 212 Ill. 2d at 464; *In re J.W.*, 386 Ill. App. 3d at 856; *In re Christopher S.*, 364 Ill. App. 3d 76, 89 (2006).

¶ 81                                         III. Conclusion

¶ 82     For the foregoing reasons, we affirm the judgment of the Washington County circuit court.


¶ 83     Affirmed.